L. W. FERRELL and Jo Ferrell, Next Friends of Phillip Ferrell, June Webb, Next Friend of Stephen Webb, and V. R. Jarvis and Margaret Jarvis, Next Friends of Paul Jarvis, Plaintiffs,

v.

DALLAS INDEPENDENT SCHOOL DISTRICT, W. T. White and W. S. Lanham, Defendants.

Civ. A. No. 3–1670.

United States District Court
N. D. Texas,
Dallas Division.

Dec. 9, 1966.

Gibbs, Hooks & Wyrick, Herbert L. Hooks, Dan Gibbs, Kelvin Wyrick, Dallas, Tex., for plaintiffs.

Franklin E. Spafford and Warren Whitham, Dallas, Tex., for defendants.

## OPINION

WILLIAM M. TAYLOR, Jr., District Judge.

Plaintiffs brought this action for an alleged violation of the right of the minor plaintiffs, Phillip Ferrell, Stephen Webb, and Paul Jarvis, to attend W. W. Samuell High School in the Dallas Independent School District, alleging that jurisdiction of this court was based upon § 1 of Amend. 14 of the United States Constitution and the Civil Rights Act of 1964, Public Laws 88–352, Title 42, U.S. Code Annotated, and particularly §§ 1981, 1983 and 2000a. Plaintiffs alleged that the minor plaintiffs were, in all respects, qualified to enter the academic facilities of the Defendant, Dallas Independent School District, but were being denied the right to admission and enrollment solely because of the length and style of the minor plaintiffs' hair; that Defendant W. S. Lanham, Principal of W. W. Samuell High School, discriminated against the minor plaintiffs and that such action was arbitrary, discriminatory, and violated the constitutional right of plaintiffs to equal opportunity for a public education. Because of the rec-

ognized importance of an education and the importance of classroom work at the commencement of school, a temporary order requiring admission of the minor plaintiffs was granted pending hearing and was made returnable to the Court on September 22, 1966.

Defendants, Dallas Independent School District, W. T. White, Superintendent of the Dallas Independent School System, and Defendant W. S. Lanham, Principal of the W. W. Samuell High School, answered and among other things questioned the jurisdiction of this Court on the ground that no question arising under the Constitution or laws of the United States was before this Court. The Defendants also claimed that the alleged Federal questions were frivolous and unsubstantial, and also that the Court had no jurisdiction for the reason that plaintiffs had failed to exhaust their administrative remedies by submitting or presenting to the Board of Education of the Dallas Independent School District, State Commissioner of Education, and the State Board of Education, the alleged claim. These legal defenses were taken under advisement and the Court proceeded to hear the testimony offered by plaintiffs and Defendants.

It appears from the testimony that on the morning of September 7, 1966, the opening day of school, instead of reporting to their home rooms, as was the usual procedure, the Plaintiff Stephen Webb, accompanied by his mother, the Plaintiff Phillip Ferrell, accompanied by his mother, and Plaintiff Paul Jarvis, accompanied and represented by Kent Alexander, the booking agent of the minor plaintiffs, went to the office of Mr. Lanham, the Principal of W. W. Samuell High School. The purpose of this visit was to confer with Mr. Lanham, it being understood that admission to the high school would be denied by Mr. Lanham because of the hair style of the boys. Mr. Lanham refused to admit the boys to school and advised them to get their hair cut or trimmed before coming back to enroll.

The minor plaintiffs are members of a musical group or "combo" known

as Sounds Unlimited, and insisted to Mr. Lanham that they were under contract with Mr. Alexander to maintain their dress and personal appearance, including the so-called "Beatle" type hair style. The contract, Plaintiffs' Exhibit 11, is in evidence and does so provide. There seems to be little question, however, under Texas law, that this contract is unenforceable insofar as the minors are concerned. 30 Tex.Jur.2d 678, Infants, § 19, et seq.

As described by the mother of Stephen Webb, who was 18 years of age on September 7, 1966, Stephen's hair "is over his ears, but one can see the lobe of his ear. It is not over his collar, but is over his forehead and down to his eyebrows." As described by the mother of Paul Jarvis, "his hair is about 1 inch over his ears and about 1½ inches above his eyebrows." Phillip Ferrell's hair, if hanging straight forward, would come below his eyebrows, but is combed and turned to the side so as to be a very short distance above his eyebrows. The hair extends down to the ear lobe on the side and to the collar in the back. This hair style adopted by these plaintiffs is in conformity with the so-called "Beatle" type hair style. There are numerous pictures admitted in evidence in the record, not only of plaintiffs, but also of other musical combos, more accurately showing this Beatle type hair style. Among other things, the boys testified that they had attended W. W. Samuell High School the year before and that their hair during that school year had been as long as it was on September 7, 1966.

After being refused admission to W. W. Samuell High School, the boys went to several other Dallas High Schools seeking admission by transfer from the Samuell High School District. They were advised by Mr. Lanham that it was too late to make application for transfer to another high school. Within a short time the boys went to the Administration Building of the Dallas Independent School District to see the Superintendent, and according to the testimony of Paul Jarvis, were met on the steps by a Mr. Allen, whom he understood to be the Assistant Superintendent. They were advised by Mr. Allen that there was no rule concerning the length of a boy's hair and that the Principal of each school set his own rules and regulations in this regard and that there was no written rule in the book. It also appears that Mr. Lanham first told Paul Jarvis that he would be admitted, but would have to have his hair trimmed in a couple of days. However, when Jarvis went to school the next day he was advised by Mr. Lanham that the matter had been reconsidered and that he would not be admitted until he did have his hair trimmed.

Plaintiffs called to the witness stand some seven young boys, ages 17 and 18, who had the Beatle type hair style, three of whom attended W. W. Samuell High School, two of whom attended Mesquite High School, one of whom attended W. T. White High School, and one of whom was attending Dallas Junior College. From their testimony it appeared that this type hair style had been in vogue about three to three and a half years and that some problems had developed in the beginning, but that this type of hair style was now generally accepted by other students and occasioned no difficulties at this time. One of the Mesquite High School students testified that he thought that the coaches, athletes and teachers created whatever problems developed in regard to the long hair. There was some testimony to the effect that some of the athletes at a nearby high school were now wearing the Mohawk style haircut.

Plaintiffs called Principal Lanham to the stand, and on this examination it appears that in his administration of the W. W. Samuell High School he was governed by the Policy Book of the Dallas Independent School District; that he was charged with controlling the attire of a student; that the boys' long hair caused trouble and commotion; that the long hair frequently caused the exchange of obscene remarks to the long-haired boys; that the long hair did attract attention and was disruptive in the classroom; that

he had not ruled out long hair, but did not accept the extreme Beatle type hair style. It also developed from Mr. Lanham's testimony that on the night of September 6 Kent Alexander, the boys' agent, had called him at home inquiring whether or not these particular boys would be admitted and, among other things, Mr. Alexander advised him that he had $4000.00 invested in these boys and that he was willing to invest another $1000.00. Mr. Lanham further testified that the boys in question should have gone to their home room to get their schedules and then to later enroll, in which event he would not have seen them for possibly two or three weeks; that the Alexander phone call and the appearance of the boys at his office on the opening day of school constituted a challenge to his authority and his responsibility to maintain good order and discipline in the school. Mr. Lanham also said that there was a correlation between discipline and dress or attire.

Plaintiffs also called to the stand Dr. W. T. White, Superintendent of the Dallas Independent School District. Dr. White produced the Book", which is entitled "Administrative Policies and Procedures of the Dallas Independent School District." It appears in the record as Defendants' Exhibit 2. Among other things, these administrative policies and procedures provide, Page 83, as follows:

"PUPILS—CONDUCT, OFFENSES, AND PUNISHMENTS

"ATTIRE

Principals will determine when attire of students is in good taste.

"CONDUCT

Children may be held responsible for their conduct to and from school if it affects school organization, school morale, or destruction of public or private property."

In this connection, Dr. White said that attire had to do with the appearance of the child. With reference to duties and responsibilities of the Principal and Assistant Principal, (page 164), it is provided that the Principal is the Chief Administrator in his building and, as such, he is fully responsible for all areas of operation, either through personal action or through assignment to personnel in the building. Dr. White testified that this book is partially the Principal's guide and that there must be added common sense, tact, firmness and policy guidance by the Superintendent of Schools or from an authorized staff member; that results of the program in his building come to him for credit or discredit; and that the Principal's areas of responsibility are in administration, organization, operation, instruction, curriculum, supervision, personnel, pupil management, budget, parent relations, public information, and leadership. Dr. White further testified that the matter of length of a boy's hair was within the authority of the Principal and that in this case he felt that the authority of the Principal to run his school had been called into question. Dr. White further said that through a telephone call he advised one of Plaintiffs' attorneys that he, as Superintendent of the schools, would stand behind the Principal. It appears further from the testimony that there was a second confrontation with Mr. Lanham on the following day, September 8. Prior to this incident, the booking agent, Alexander, affectionately called "Alexander, the Great" by the boys, had notified three television stations and about half-a-dozen radio stations of the situation at the school and suggesting the presence of these news media at the school on the coming day. The radio and television reporters responded and following this conference with Mr. Lanham, the group conducted interviews with and were photographed by these news representatives. The story was subsequently reported on all television channels complete with films and interviews, in both of the local newspapers and received nationwide attention through the wire services.

It was also developed by the defendants that immediately after being refused admittance the "Sounds Unlimited" proceeded to a local recording studio and recorded a song entitled, "Keep Your

Hands Off of It." Copies of the record were produced and distributed by the agent to the various radio stations in the area, and was subsequently played on the air by these stations. This record was played in open court, and to say the least, it was an excursion into cacaphony. The words went something like this:

"Went to school, got kicked out,
Said it was too long, now we're going to shout.
(Chorus)
"Keep your hands off of it,
Keep your hands off of it,
It don't belong to you.
"Bopped upon the steps, Principal I met,
You're not getting in, now what do you want to bet.
(Chorus)
"Went this morning, tried to get in,
The kids were for us, but we still couldn't win.
(Chorus)
"HAIR, THAT IS." (Defendants' Ex. #1)

█ The first legal point to consider is whether this court has jurisdiction over this cause of action. One of defendants' grounds for dismissal is the failure of the plaintiffs to exhaust their administrative remedies by submitting or presenting it to the Board of Education of the Dallas Independent School District, the State Commissioner of Education and the State Board of Education. (Vernon's Ann. Tex. Stats., Art. 2654–5, § 1; Art. 2656, 2654–3, § 2, 2654–7, § 1). Under Title 42, U.S.C.A. § 1983, one of the alleged grounds for jurisdiction of this cause, the failure to first seek remedies under state law, will not defeat an application for relief under this Act. (McNeese v. Board of Education, Cahoka, Ill., 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed. 2d 622; Monroe v. Pape, Ill.1961, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492.)

█ Another ground for dismissal for lack of jurisdiction is that the alleged federal questions are "frivolous and unsubstantial." With this contention we do not agree, and are of the opinion that the matter is controlled by the now historic case of Brown v. Board of Education of Topeka, et al., infra:

"Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms." Brown v. Board of Education, 347 U.S. 493, 74 S.Ct. 686, 691, 98 L.Ed. 873, 38 A.L.R.2d 1180.

The Constitution of the State of Texas, Art. 7, § 1, reads as follows:

"A general diffusion of knowledge being essential to the preservation of the liberties and rights of the people, it shall be the duty of the Legislature of the State to establish and make suitable provision for the support and maintenance of an efficient system of public free schools."

The Defendants' Motion to Dismiss for lack of federal jurisdiction is overruled and it is our opinion that the Federal District Court is a proper forum for the determination of the question presented here.

The problem that causes this court the most concern is whether or not the actions taken by the school authorities deprive plaintiffs of any rights guaranteed by the Constitution and Laws of the United States. The plaintiffs contend they are arbitrarily being denied

the right to a public school education which the state has undertaken to provide for all. These facts are considered because the determination here becomes more specifically: Were the actions of the school authorities in excluding the plaintiffs from high school unlawful under state law? This was the first part of a two-part test used in Byrd v. Sexton, 8 Cir., 277 F.2d 418 (cert. den.). The remainder of the test used by the court in that case then became: Were the school authorities motivated to act the way they did by reason of plaintiffs' membership in some class or group of persons which the United States has determined to protect? There, the plaintiffs had to prove the first requirement before this second part of the test would be applied. In that case, the court assumed that state law had been violated, but determined, after consideration of recent segregation cases (Brown v. Board of Education, supra, etc.) the history of the civil rights statutes[1], the atmosphere under which the statutes were enacted[2], and the statutes' limited recognition in the courts, that the plaintiff claimed no invalidity of state law or of state constitutional provision, but at the most complained of acts said to be improper under the state Constitution. The Court further determined that plaintiffs' cause of action, if any, was for invasion of personal rights for which state laws and state forums provide the avenue of

relief and "because the decisions which have been promulgated, * * * seem to us clearly to outline a specific and narrow area of applicability of the statutes and one which the plaintiff's case does not reach." (Byrd v. Sexton, supra.)

Counsel for plaintiffs contend that Byrd v. Sexton is distinguishable on the grounds that it was a suit for damages and the instant case is one seeking equitable relief. The Supreme Court has made passing references to these sections as providing relief in appropriate situations[3], and has used them as a basis for granting equitable relief[4]. However, where the Court felt that the complaint established a case within the adjudicatory power of the federal courts under the statutes, or assumed that it did, it has been cautious in granting relief where to do so would interfere with state court proceedings or where "the proper balance between the States and the federal government in law enforcement" would be affected. See Screws v. United States, 325 U.S. 91, 108; 65 S.Ct. 1031, 1039, 89 L.Ed. 1495, and Stefanelli v. Minard, at page 121 of 342 U.S., at page 120 of 72 S.Ct., or until every chance has been given the state courts first to construe the challenged state regulations, Harrison v. N. A. A. C. P., 360 U.S. 167, 79 S.Ct. 1025; 3 L.Ed.2d 1152. These contingencies are perhaps best illustrated by Mr. Justice Frank-

1. These sections came into the present Code from the old Revised Statutes, § 1979 and § 1980, respectively, and those in turn had their origin in the early Civil Rights Acts, particularly the Act of April 20, 1871, 17 Stat. 13, adopted soon after the Civil War to implement the then recent Thirteenth, Fourteenth and Fifteenth Amendments. They were thus designed for a specific purpose. This history and this purpose have been noted and emphasized by the Supreme Court, Hague v. C.I.O., 307 U.S. 496, 509–510, 59 S.Ct. 954, 83 L.Ed. 1423; United States v. Williams, 341 U.S. 70, 73 et seq., 88, 71 S.Ct. 581, 95 L.Ed. 758; Collins v. Hardyman, 341 U.S. 651–656, 71 S.Ct. 937, 95 L.Ed. 1253; Stefanelli v. Minard, 342 U.S. 117, 121, 72 S.Ct. 118, 96 L.Ed. 138; see Mr. Justice Roberts, dissenting, in Screws v.

United States, 325 U.S. 91, 140 et seq., 65 S.Ct. 1031, 89 L.Ed. 1495; Love v. Chandler, 8 Cir. 124 F.2d 785, 786; Francis v. Lyman, 1 Cir., 216 F.2d 583 at 586.

2. Byrd v. Sexton, supra, 277 F.2d at p. 427 ff.

3. Ray v. Blair, 343 U.S. 214, 72 S.Ct. 654, 96 L.Ed. 894; O'Sullivan v. Felix, 233 U.S. 318, 34 S.Ct. 596, 58 L.Ed. 980; see Mr. Justice Frankfurter's dissent in Burns v. State of Ohio, 360 U.S. 252, 79 S.Ct. 1164, 3 L.Ed.2d 1209.

4. Hague v. C.I.O., 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423; Brown v. Board of Education, supra; United States v. Raines, 362 U.S. 17, 80 S.Ct. 519, 4 L. Ed.2d 524.

furter's comment, concurring in Snowden v. Hughes, at page 16 of 321 U.S. 1, at page 405 of 64 S.Ct. 397, 88 L.Ed. 497:

"Our question is not whether a remedy is available for such illegality (if any), but whether it is available in the first instance in a federal court. Such a problem of federal judicial control must be placed in the historic context of the relationship of the federal courts, with due regard for the natural sensitiveness of the states and for the appropriate responsibility of state courts to correct the action of lower state courts and state officials."

With these ideas in mind we desire to at least comment on the merits of this case insofar as they affect the jurisdiction of this court. This case has received a great deal of publicity and aroused a great deal of feeling in the community. It is felt therefore that we should say more than merely whether or not this Court has jurisdiction to rule on this case. At the outset it should be emphasized that this is a case involving high school students and their administrators; we in no way even propose to consider such a situation arising between college students and their administrators. (Marshall, et al. v. Oliver, cert. den. Nov. 14, 1966, 385 U.S. 945, 87 S.Ct. 319, 17 L.Ed.2d 225, involving the rights of students at the institute to wear long hair and beards. Here the action of the school authorities was upheld.)

Having determined now that this court has jurisdiction of this case, what are the questions the court must resolve? Referring to the first part of the test announced in the *Byrd* case—were the school authorities legally authorized to formulate the regulation that students' hair shall not be of "Beatle-length"? There are two ways to approach this problem of authorization. The court could focus on the school administration and attempt to justify the regulation by emphasizing the educational need for an academic atmosphere and the resulting demand that disturbances be kept to a minimum. Or, it can focus more direct-ly on the individual student and evaluate the need for regulation by examining the purpose of public school education in terms of the individual. The regulation must serve both purposes. We feel that where the effects of the regulation extend beyond the classroom and bear directly on the student's person and his freedom of expression, the latter approach provides a more reasonable basis for school concern, and it is here that the court should look to justify the regulation. (The Power of School Officials to Regulate Student Appearance, 3 Harv.Legal Comm.)

█ Since confusion and anarchy have no place in the classroom, school authorities must control the behavior of their students. If the student's dress is lewd or his appearance is a studied effort to draw attention to himself, his presence is disruptive—such behavior is no different than verbal rudeness.

"Where the student's deviant appearance is not a manifestation of a negative antisocial personality, the problem becomes more difficult. It puts a strain on the words to prohibit the wearing of clean, combed, long hair in the name of educational efficiency. And such reasoning can be circular since the school's effort to single out such behavior as disruptive often creates the disruption. This is especially true when the issue is long hair. The Beatle-cut is the current fad, and at summer's end, extra long bangs are not a novelty among teenagers. The educational system suffers many minor disruptions every day; the interstudent feud that starts during school hours, and the classes that are cut to manufacture prom decorations. It should not be so finely tuned that it clogs on an extra two inches of hair." (3 Harv.Legal Comm., supra.)

It is difficult moreover to determine in a specific case the extent to which school authorities should concern themselves with what they consider improper student appearance or behavior when such regulation would impinge on the

student's freedom and the individual parent's right to raise his child as he sees fit.

The testimony here showed that Mr. Lanham, the Principal, acted on the basis of some prior incidents involving students with long hair. Further testimony from high school students revealed that there were no longer any disturbances resulting from long hair on boys because it "had been around three or four years and everyone was used to it." Other evidence tended to show that long hair on men was part of a "total look" called the "Mod" look.

■ The regulation in question here arises from the generally accepted proposition that the superintendent, principal, and board of trustees may officially exercise whatever powers of control, restraint, and correction over pupils as may be reasonably necessary to "enable teachers to perform their duties and to effect the general purposes of the educational system." (51 Tex.Jur.2d, § 237; Bishop v. Houston Ind. School Dist., 119 Tex. 403, 29 S.W.2d 312; City of Dallas v. Moely, Tex.Civ.App., 286 S.W. 497; Boseman v. Morrow, Tex.Civ.App., 34 S.W.2d 654). Two other cases involving students with long hair, although from other jurisdictions, have influenced the decision in this case. Foremost of these is the case of Marshall et al. v. Dr. George Oliver (supra), where the U. S. Supreme Court dismissed an appeal from the Supreme Court of the State of Virginia. If a state has constitutional authority to regulate the appearance of college students, *a fortiori*, it has the same power over high school students. The other case is Leonard et al. v. School Committee of Attleboro et al., Mass., 212 N.E.2d 468, where the Supreme Court of Massachusetts held that regulations which barred a student with an extreme haircut from attending classes solely because of length or appearance were not unreasonable or arbitrary and had a reasonable connection with the successful operation of public school.

This court is concerned for the welfare of the individual plaintiffs in this case, but feels that the rights of other students, and the interest of teachers, administrators and the community at large are paramount. It also appears that there is a fairly reasonable indication that this situation could have been deliberately planned by the previously mentioned "agent" for the boys. The phone call to the principal's home and the subsequent confrontation of the principal by the boys and their agent, followed immediately by a song and news interviews (previously arranged by the agent), give support to this supposition. Plaintiffs contend naturally that their primary interest is to get an education, but it appears that they want this education on their own terms. It is inconceivable that a school administrator could operate his school successfully if required by the courts to follow the dictates of the students as to what their appearance shall be, what they shall wear, what hours they will attend, etc.

■ One of the most important aims of the school should be to educate the individual to live successfully with other people in our democracy. Since the school authorities, by legislative grant, control the public educational system, their regulations play a part in the educational process. This is but another way of stating that society expects public education to concern itself with building young citizens as well as teaching the "3 R's". It does not appear from the facts of this particular case that there has been any abuse of discretion on the part of the school authorities. On the contrary, it appears that they acted reasonably under the circumstances, taking into consideration these individual students *and* the need for an academic atmosphere. The school principal felt that his authority was being challenged when the boys did not follow the usual registration procedure, but came instead to his office with the proposition that they were under contract to keep their hair "Beatle Length" and did not intend to cut it. It is, therefore, the opinion of this Court that there has been no violation of minor plaintiffs' rights, ei-

ther state or federal, by the school authorities. For this reason Plaintiffs' case fails to pass this first part of the test heretofore announced. Further, the terms upon which a public free education is granted in the high schools of Texas cannot be fixed or determined by the pupils themselves. Nor is a contract which is unenforceable against the minor plaintiffs in this State to be considered determinative of the right.

The temporary restraining order is dissolved and the motion for temporary injunction is denied.

This Memorandum Opinion is in lieu of findings of fact and conclusions of law.