C. C. WATSON, as Next Friend of Duran Eugene Watson, a minor; Royce Rumsey, as Next Friend of Jimmy Rumsey, a minor,

v.

C. W. THOMPSON, Superintendent of Pittsburg County Line Consolidated Independent School District; Neal Hinson, Dean of Students of Pittsburg County Line Consolidated Independent School District; and Robert Taylor, R. K. Pendegrass, Robert Barnwell, Brown Bolton, John E. Smith, Marshall Hobbs and Emmett Phillips, Individually and as Members of the Board of Trustees of Pittsburg County Line Consolidated Independent School District.

Civ. A. No. 1474.

United States District Court,
E. D. Texas,
Marshall Division.

Jan. 6, 1971.

W. C. Hancock, Pittsburg, Tex., for plaintiffs.

L. E. Bell, Jr., Pittsburg, Tex., for defendants.

## MEMORANDUM OPINION

JUSTICE, District Judge.

The plaintiffs in this suit are two Pittsburg, Texas youths, and their fathers as next friends. The suit seeks vindication, under Title 42 U.S.C. Section 1983, of the youths' asserted constitutional right to wear long hair while attending local public high school. The defendants are the superintendent, dean of students, and members of the board of trustees of the Pittsburg County Line

Consolidated Independent School District. The administrative officers of the defendant school district have promulgated and enforced a policy and practice which denies the use of its public educational facilities to male students who affect certain hair length and style. The local school board supports this policy and practice. Having allowed their hair to become violative of the regulation, custom, and usage established by this instrumentality of the State of Texas, the plaintiffs have been dismissed from the Pittsburg High School and are prevented from enjoying the benefits of attending that institution unless and until they have their hair cut to the prescribed length and style. Plaintiffs, Duran Eugene Watson and Jimmy Rumsey, wish to return to school and to retain their lengthy locks. They seek injunctive relief.

■ There is no doubt that this court has jurisdiction, pursuant to Title 28 U.S.C. Section 1343(3) and (4), to grant such injunctive relief as may be necessary to protect the exercise of constitutional rights by these young men. See the discussion in Richards v. Thurston, 304 F.Supp. 449, at 455–457 (D.Mass. 1969), the cases cited in Westley v. Rossi, 305 F.Supp. 706, at 712–713 (D.Minn. 1969), and the analysis in Hall v. Garson, 430 F.2d 430 (5th Cir. 1970).

The current spate of long hair cases in federal courts began with Ferrell v. Dallas Independent School District, 261 F.Supp. 545 (N.D.Tex.1966), aff. 392 F.2d 697 (5th Cir. 1968), cert. den. 393 U.S. 856, 89 S.Ct. 98, 21 L.Ed.2d 125 (1968), and it is bootless to hope that the ensuing succession of hirsute controversies will end with the present action. At first blush, matters of tonsorial propriety seem to be, as Judge Tuttle remarked, "something of a tempest in a teapot," *Ferrell*, supra, at 392 F.2d 705 (dissenting opinion). It appears almost pathetic that the time of a federal court would be occupied in determining whether adolescent males are to be permitted to avoid barbers' clippers for months on end and style their hair almost as elaborately as that of their female schoolmates.

"But it must not be forgotten, however small the community, however familiar to one another the characters in the drama, that when a school board undertakes to expel a public school student, it is undertaking to apply the terrible organized force of the state, just as surely as it is applied by the police, the courts, the prison warden, or the militia." Breen v. Kahl, 296 F.Supp. 702, at 707 (W.D.Wisc.1969), aff. 419 F.2d 1034 (7th Cir. 1969), cert. den. 398 U.S. 937, 90 S.Ct. 1836, 26 L.Ed.2d 268 (1970).

The ultimate rationale for serious consideration of the issue before this court was ably set out in Brown v. Board of Education of Topeka, 347 U.S. 483, at 493, 74 S.Ct. 686, at 691, 98 L.Ed. 873 (1954).

"Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument of awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms."

That the state of Texas recognizes the fundamental importance of education is abundantly clear.

"A general diffusion of knowledge being essential to the preservation of the liberties and rights of the people,

it shall be the duty of the Legislature of the State to establish and make suitable provision for the support and maintenance of an efficient system of public free schools." Vernon's Ann. Const. of Texas, Art. 7, Sec. 1, Vernon's Ann.Tex.St.

"[E]very child in the state who is as much as seven years of age and not more than 17 years of age shall be required to attend the public schools * * *" Vernon's Ann. Education Code of Texas, Sec. 21.032.

There is likewise no doubt that local school boards have the power to manage local schools.

"The trustees may adopt such rules, regulations, and by-laws as they may deem proper." Vernon's Ann. Education Code of Texas, Sec. 23.26(d).

"They may make all such rules and regulations as in their judgment are necessary to maintain an 'efficient' system of schools, subject to the limitation that there be no abuse of discretion, and that such regulations be not arbitrary, unreasonable or in violation of law." Wilson v. Abilene Independent School Dist., 190 S.W.2d 406, at 412 (Tex.Civ.App., Eastland, 1945).

But decades ago, the Supreme Court stated that

"[t]he Fourteenth Amendment, as now applied to the States, protects its citizen against the State itself and all of its creatures—Boards of Education not excepted. * * * That they are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." West Virginia State Board of Education v. Barnette, 319 U.S. 624, at 637, 63 S.Ct. 1178, at 1185, 87 L.Ed. 1628 (1943). Cf. Shelton v. Tucker, 364 U.S. 479, at 487, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960).

Consequently, some supervening and overriding factor is necessary to sustain the exclusion of these plaintiffs from the public educational facilities of Pittsburg, Texas.

Though the Supreme Court has not yet found it appropriate to write on the issue of prohibitions against long hair in public high schools, its most recent pronouncement on the rights of students should be noted. In Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), the Court was considering a regulation that prohibited students from wearing black arm bands representing protest against the Government's policy in Vietnam. The Court recognized that this symbolic gesture

"was closely akin to 'pure speech' which, we have repeatedly held, is entitled to comprehensive protection under the First Amendment.

\* \* \* \* \* \*

"In the circumstances, our Constitution does not permit officials of the State to deny their form of expression." Tinker, supra, at 505–506, 514, 89 S.Ct. at 736, 740.

In so holding, Justice Fortas had pointed out that

"[t]he school officials banned and sought to punish petitioners for a silent, passive expression of opinion, unaccompanied by any disorder or disturbance on the part of petitioners. *There is here no evidence whatever of petitioners' interference, actual or nascent, with the schools' work or of collision with the rights of other students to be secure and to be let alone.* Accordingly, this case does not concern speech or action that intrudes upon the work of the schools or the rights of other students." [Emphasis added.] Tinker, supra, at 508, 89 S. Ct. at 737.

In analyzing the Constitutional viability of the regulation at issue in Tinker, supra, at 505, 509, and 514, 89 S.Ct. 733, the Supreme Court adopted the standard which it applied to determine whether

such an invasion of protected freedom was justified from *Burnside v. Byars,* 363 F.2d 744, at 749 (5th Cir. 1966), i. e., whether the forbidden activity would

> "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school."

Because the Court of Appeals for the Fifth Circuit placed reliance upon *Burnside* and the companion case of *Blackwell v. Issaquena County Board of Education,* 363 F.2d 749 (5th Cir. 1966), in its opinion in *Ferrell,* it is important to examine the reasoning of the two cited decisions. At issue in *Burnside* and *Blackwell* were similar regulations prohibiting the wearing of "freedom buttons." At the outset, it must be observed that the wearing of such a button is not significantly different from the wearing of a black arm band. Hence, it is also closely akin to pure speech; and thus neither is, in and of itself, conceivably classifiable as conduct. Why the same panel of the Fifth Circuit reversed the trial court in *Burnside* and affirmed the lower court in *Blackwell* can best be understood by extended quotations from each. In *Burnside,* supra, 363 F.2d at 748, the Court of Appeals said:

> "Even the principal testified that the children were expelled not for causing a commotion or disrupting classes but for violating the school regulation. Thus it appears that the presence of 'freedom buttons' did not hamper the school in carrying on its regular schedule of activities; nor would it seem likely that the simple wearing of buttons *unaccompanied by improper conduct* would ever do so. \* \* \* Nor do we think that the mere presence of 'freedom buttons' is calculated to cause a disturbance sufficient to warrant their exclusion from school premises *unless there is some student misconduct involved."* [Emphasis added.]

In *Blackwell,* supra, 363 F.2d at 753, 754, the court said:

> "In the case now before us, the affidavits and testimony from the District Court present quite a different picture from the record in *Burnside* where no disruption of classes or school routine appeared in the evidence. Here \* \* \* *students conducted themselves in a disorderly manner, disrupted classroom procedure, interfered with the proper decorum and discipline of the school and disturbed other students who did not wish to participate in the wearing of buttons.*

> \* \* \* \* \* \*

> "The facts demonstrate that during the time students wore freedom buttons to school, *much disturbance was created by these students.*

> \* \* \* \* \* \*

> "Again we emphasize the difference in the conduct here involved and that involved in *Burnside.* In this case the reprehensible conduct described above was so inexorably tied to the wearing of the buttons that the two are not separable." [Emphasis added.]

Likewise, the trial judge's recitation in *Ferrell,* supra, 261 F.Supp. at 546–549, of the evidence in that case, indicates a situation where the tomentose appearance of the plaintiffs, essentially passive in itself, was inextricably bound up with disruptive conduct. In summarizing, Judge Taylor said:

> "The school principal felt that his authority was being challenged when the boys did not follow the usual registration procedure, but instead came to his office with the proposition that they were under contract to keep their hair 'Beatle Length' and did not intend to cut it." *Ferrell,* supra, at 552.

Moreover, the preceding call to the principal by the boys' booking agent and the subsequent confrontation on the opening day of school, along with the instigation of massive news coverage, followed immediately by the cutting of a so-called protest record—all these fac-

tors led Judge Taylor to conclude as follows:

"It also appears that there is a fairly reasonable indication that this situation could have been deliberately planned by the previously mentioned 'agent' for the boys." *Ferrell*, supra, at 552.

Furthermore, in making his decision, Judge Taylor perceptively recognized that

"[w]here the effects of the regulation extend beyond the classroom and bear directly on the student's person

\*    \*    \*    \*    \*    \*

"[the court must] evaluate the need for regulation by examining the purpose of public school education in terms of the individual.

\*    \*    \*    \*    \*    \*

"Since confusion and anarchy have no place in the classroom, school authorities must control the behavior of their students. If the student's dress is lewd or his appearance is a studied effort to draw attention to himself, his presence is disruptive— such behavior is no different than verbal rudeness.

" 'Where the student's deviant appearance is not a manifestation of a negative antisocial personality, the problem becomes more difficult. It puts a strain on the words to prohibit the wearing of clean, combed, long hair in the name of educational efficiency. And such reasoning can be circular since the school's effort to single out such behavior as disruptive often creates the disruption. This is especially true when the issue is long hair. \* \* \* The educational system suffers many minor disruptions every day; the interstudent feud that starts during school hours, and the classes that are cut to manufacture prom decorations. It should not be so finely tuned that it clogs on an extra two inches of hair \* \* \* (The Power of School Officials to Regulate Student Appearance, 3

Harv.Legal Comm.)' " *Ferrell*, supra, at 551.

The appellate opinion affirming Judge Taylor's decision assumed, *Ferrell*, supra, 392 F.2d at 702, though it did not decide, that hair style is a constitutionally protected mode of expression of ideas. The plaintiffs in the complaint in the instant case assert violation of their First Amendment rights, implying that their long hair represents an idea, perhaps the counter-culture or an anti-establishment attitude. If long hair were conclusively held to be symbolic of such an idea, it seems hardly open to question that wearing it in such a manner would be within the ambit of protection afforded to pure speech. But the logical implication of the somewhat ambiguous reference in *Tinker* to *Ferrell* would seem to rebut the idea that hair style is protected by the First Amendment.

"The problem posed by the present case does not relate to regulation of \* \* \* hair style \* \* \* Cf. Ferrell v. Dallas Independent School District, 392 F.2d 697 (1968) \* \* \* " *Tinker*, supra, 393 U.S. at 507–508, 89 S.Ct. at 737.

Anthropologists and sociologists readily recognize that hair has always been of immense significance to mankind. Moreover, only within the last century or so have relatively close-cropped hair and clean-shaven faces become the dominant male fashion. Like Judge Wyzanski,

"[t]his court takes judicial notice that hair styles have altered from time to time throughout the ages. Samson's locks symbolically signified his virility. Many of the Founding Fathers of this country wore wigs. President Lincoln grew a beard at the suggestion of a juvenile female admirer. Chief Justice Hughes' beard furnished the model for the frieze over the portico of the Supreme Court of the United States proclaiming 'equal justice under law'. Today many of both the younger and the older gen-

erations have avoided the increased cost of barbering by allowing their locks or burnsides to grow to greater lengths than when a haircut cost a quarter of a dollar.

"Whether hair styles be regarded as evidence of conformity or individuality, they are one of the most visible examples of personality. This is what every woman has always known. And so have many men, without the aid of an anthropologist, behavioral scientist, psychiatrist, or practitioner of any of the fine arts or black arts." Richards, supra, 304 F.Supp. at 451. Cf. *Westley*, supra, 305 F.Supp. at 714; Sims v. Colfax Community School District, 307 F.Supp. 485, at 489 (S.D.Iowa, 1970), and Calbillo v. San Jacinto Junior College, 305 F.Supp. 857, at 862 (S.D.Tex.1969).

Nevertheless, even if the Supreme Court had held conclusively that "the method of wearing hair is not constitutionally protected under the First Amendment," *Ferrell*, supra, 392 F.2d at 705 (Tuttle, J., dissenting), I am of the opinion that the regulation of hair length and style would be an abridgment of individual liberty protected by the Fourteenth Amendment.

"Without doubt, * * * [Fourteenth Amendment liberty] denotes *not merely freedom from bodily restraint* * * *" [Emphasis added.] Meyer v. Nebraska, 262 U.S. 390, at 399, 43 S.Ct. 625, at 626, 67 L.Ed. 1042 (1923).

"[Fourteenth Amendment] liberty is *something more than exemption from physical restraint* * * *" [Emphasis added.] Palko v. Connecticut, 302 U.S. 319, at 327, 58 S.Ct. 149, at 153, 82 L.Ed. 288 (1937).

Pinpointing the source of this very personal right involves essentially the same process employed by the Supreme Court to explicate the analytical framework which elucidated the principle of privacy upheld in its decision in Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).

The Fourth Amendment's search and seizure provision clearly has relevance to the right of a person to be free from physical intimidation in specific situations. Moreover,

"[i]t would surely be an extreme instance of sacrificing substance to form were it to be held that the Constitutional principle of privacy [as embodied in the Fourth Amendment] against arbitrary official intrusions comprehends only physical invasions by the police." Poe v. Ullman, 367 U.S. 497, at 551, 81 S.Ct. 1752, at 1781, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting).

Yet there seems to have been little occasion for judicial discussion of this basic right to personal security as an aspect of liberty in general under the Due Process Clause. The explanation, it seems to me, lies in Americans' historical belief in the undeniability of their innate right to physical integrity. Apparently, however, the pressures of rapidly evolving mores in modern America have made the possibility of governmental interference with the physical integrity of younger citizens a reality. When a male high school student is threatened with the loss of opportunity to obtain an education, it is of little moment that the coercion is exercised by an authoritarian demand that he get a haircut, rather than by a school administrator himself tieing down and shearing the boy.

The Supreme Court long ago recognized the fundamental importance of affording significant protection to a person's sovereignty over his own body.

"No right is held more sacred, or [sic] is more carefully guarded * * * than the right of every individual to the possession and control of his own person, free from all restraints or interference of others, unless by clear and unquestionable authority of law. As well said by Judge Cooley, 'The right to one's person may be said to be a right of complete immunity: to be let alone.' Cooley on Torts, 29." Union Pacific Railway Company v.

Botsford, 141 U.S. 250, at 251, 11 S.Ct. 1000, at 1001, 35 L.Ed. 734 (1891).

A classic statement of this elemental principle of human freedom—the right to be let alone—can be found in the renowned dissent of Justice Brandeis in Olmstead v. United States, 277 U.S. 438, at 478, 48 S.Ct. 564, at 572, 72 L.Ed. 944 (1928).

> "The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men." Cf. Stanley v. Georgia, 394 U.S. 557, at 564, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969), *Griswold*, supra, 381 U.S. at 494, 85 S.Ct. 1678 (Goldberg, J., concurring), *Poe*, supra, 367 U.S. at 550, 81 S.Ct. 1752 (Harlan, J., dissenting).

This principle was stated in the context of a claim of unconstitutional search and seizure in violation of the Fourth Amendment. Recently, the Supreme Court has held that the protection afforded by this provision of the Bill of Rights extends to the withdrawal of a blood sample from a person under arrest.

> "The overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State.
>
>    *     *     *     *     *     *
>
> "The integrity of an individual's person is a cherished value of our society. That we today hold that the Constitution does not forbid minor intrusions into an individual's body under stringently limited conditions in no way indicates that it permits more

substantial intrusions, or intrusions under other conditions." Schmerber v. California, 384 U.S. 757, at 767, 772, 86 S.Ct. 1826, at 1836, 16 L.Ed. 2d 908 (1966).

Indeed, over eight decades ago, the Supreme Court held that the principles of the Fourth Amendment

> "apply to all invasions on the part of the government and its employees of * * * the privacies of life * * [T]he essence of the offence [sic] * * * is the invasion of his indefeasible right of personal security, personal liberty * * *." Boyd v. United States, 116 U.S. 616, at 630, 6 S.Ct. 524, at 532, 29 L.Ed. 746 (1886). Cf. Katz v. United States, 389 U.S. 347, at 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

Of course, the complexities of the modern world make it impossible for most people to obtain the utter independence from the strictures of civilization which many of our forefathers sought by packing up and traveling westward. See Geoffrey C. Hazard, Jr., editor, Law In A Changing America, Prentice Hall, Inc., 1968, Pages 45–47. As John Stuart Mill presciently depicted nearly a century ago in his essay "On Liberty",

> "[t]here is * * * in the world at large an increasing inclination to stretch unduly the powers of society over the individual, both by the force of opinion and even by that of legislation; and as the tendency of all the changes taking place in the world is to strengthen society, and diminish the power of the individual, this encroachment is not one of the evils which tend spontaneously to disappear, but on the contrary, to grow more and more formidable. This disposition of mankind, whether as rulers or as fellow-citizens, to impose their own opinions and inclinations as a rule of conduct on others, is so energetically supported by some of the best and by some of the worst feelings incident to human nature, that it is hardly ever kept under restraint by

anything but want of power; and as power is not declining, but growing, unless a strong barrier \* \* \* can be raised against the mischief, we must expect, in the present circumstances of the world, to see it increase." Great Books of the Western World, Volume 43, Page 273.

In the United States of America, the great barrier to the inevitable mischief of governmental intrusion upon personal liberty is the Constitution. And in this particular case,

> "[t]he freedom here protected is the right to some breathing space for the individual into which the government may not intrude without carrying a substantial burden of justification. \* \* \* [U]ntil one's appearance carries with it a substantial risk of harm to others, it should be dictated by one's own taste or lack of it." Griffin v. Tatum, 300 F.Supp. 60, at 62 (M.D.Ala.1969), aff. in part 425 F.2d 201 (5th Cir. 1970).

While the *raison d'etre* for the movement of population across the Northern American continent—the search for spatial freedom from the unending encroachments of an increasingly organized society—would be utopian today, hopefully the numbing effects of a deteriorating environment and suicidal overpopulation have not yet snuffed out the traditional American attachment to the ideals of individual identity, personal dignity, and self-respect. The survival of the American concept of government whose regulatory authority is limited and whose fundamental law protects the right to be let alone implies

> "a core idea: a freedom to cultivate one's own garden, heedless of the surrounding landscape which others (indifferent; hostile; or, perhaps worst of all, well-meaning) may have designed." Law In A Changing America, supra, Page 48.

As Dr. Louis H. Pollak, the distinguished Dean of the Yale Law School,

has recently noted in "To Secure the Individual Rights of the Many", in an anthology produced by Columbia University's The American Assembly,

> "Brandeis' insistence on the sanctity and centrality of 'the right to be let alone' was more than rhetoric.
>
> \*   \*   \*   \*   \*   \*
>
> "[I]n recent years \* \* \* the Justices have shown themselves to be increasingly sensitive to the importance and ubiquity of 'the right to be let alone.'" Law In A Changing America, supra, Page 47.

For example, in citing the material quoted above from Brandeis's dissent in *Olmstead,* the Supreme Court commented that

> "fundamental is the right to be free, except in very limited circumstances, from unwanted government intrusions into one's privacy." *Stanley,* supra, 394 U.S. at 564, 89 S.Ct. at 1247 (1969). See United States v. Dellapia, 433 F.2d 1252 (2nd Cir. 1970).

The framers of the Bill of Rights well realized that they could not make provision against every conceivable tyranny that the mind of man could invent.\* They "did not intend that the first eight amendments be construed to exhaust the basic and fundamental rights which the Constitution guaranteed to the people." *Griswold,* supra, 381 U.S. at 490, 85 S.Ct. 1684 (Goldberg, J., concurring). Cf. *Poe,* supra, 367 U.S. at 515–522, 81 S.Ct. 1752 (Douglas, J., dissenting) and at 539–545, 81 S.Ct. 1752 (Harlan, J., dissenting); In Re Oliver, 333 U.S. 257, at 278–283, 68 S.Ct. 499, 92 L.Ed. 682 (1948) (Rutledge, J., concurring), and Adamson v. California, 332 U.S. 46, at 123–125, 67 S.Ct. 1672, 91 L.Ed. 1903 (1947) (Murphy, J., dissenting). Considering the backgrounds of the framers and their personal experience with despotic and autocratic government, I submit that their purpose in adopting the Ninth Amendment was to retain for the people such privileges and immuni-

---

\* So far as I have been able to ascertain, not even George III sought to impose his individual standards of hairstyling upon his subjects.

ties, complemental and parallel to the enumerated rights, as might be essential for the preservation and promotion of human dignity and liberty. In various decisions, the Supreme Court has given tacit recognition to this design of the framers, employing the methodology of interpretation, extrapolation, and analogy. See ":The Unfinished Corpus Juris of Human Rights", Pages 31–45, in Charles L. Black, Jr., The Unfinished Business of the Warren Court, The Oliver Wendell Holmes Devise Lectures, Delivered at the University of Washington School of Law, Reprinted from the Washington Law Review, Volume 46, 1970.

█ It seems evident to me that the framers of the Fourteenth Amendment intended to incorporate in the liberty which no person could be deprived of without due process of law—*in toto,* but not solely—the guarantees of the first eight amendments to the Constitution. See Irving Brant, The Bill of Rights: Its Origin and Meaning, The New American Library, 1967, Pages 315–341. But, I am aware that the Supreme Court has not yet wholly adopted this position. Cf. *Griswold,* supra, 381 U.S. at 526, 85 S.Ct. 1678, 14 L.Ed.2d 510 (Footnote 21) (Black, J., dissenting). Nevertheless, there can be no doubt that many of the specific provisions of the Bill of Rights, particularly the Fourth Amendment's prohibitions, have been thus incorporated. See especially Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1967), as well as Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), and Klopfer v. North Carolina, 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed. 2d 1 (1967), among many others. Moreover these enumerated rights "have penumbras, formed by emanations from those guarantees * * *" *Griswold,* supra, 381 U.S. at 484, 85 S.Ct. at 1681. And, the fundamental right to be let alone, so often referred to in Fourth Amendment settings, lies within the penumbra of that constitutional guar-

antee, and should be classified as one of the basic rights retained by the people through the Ninth Amendment. Considering the foregoing, I conclude that the scope of the liberty protected in the Fourteenth Amendment encompasses the liberty to choose the length and style which one deems appropriate for his own hair. What is involved is nothing less than the constitutional right of individuals to preserve the sanctity of their own bodies from unwarranted invasion by the state—the right to be let alone.

Moreover, any lingering doubt that the umbrella of constitutional protection extends to cover younger people, whose claims to individual liberty and personal integrity equal that of their elders, was put to rest by *Tinker,* supra, 393 U.S. at 511–512, 89 S.Ct. at 739:

> "In our system, state-operated schools may not be enclaves of totalitarianism. School officials do not possess absolute authority over their students. Students in school as well as out of school are 'persons' under our Constitution. They are possessed of fundamental rights which the State must respect, just as they themselves must respect their obligations to the State. In our system, students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate.

> \* \* \* \* \* \*

> "In Meyer v. Nebraska, supra, 262 U.S. at 402, 43 S.Ct. at 627, Mr. Justice McReynolds expressed this Nation's repudiation of the principle that a State might so conduct its schools as to 'foster a homogeneous people.' He said:

>> 'In order to submerge the individual and develop ideal citizens, Sparta assembled the males at seven into barracks and intrusted their subsequent education and training to official guardians. Although such measures have been deliberately approved by men of great genius, their ideas touching the relation between individual and State were

wholly different from those upon which our institutions rest; and it hardly will be affirmed that any legislature could impose such restrictions upon the people of a State without doing violence to both letter and spirit of the Constitution.'" See In Re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967).

■ There is no doubt that the majority of the Court in *Griswold* clearly agreed

"that a statute which rudely invades * * * a highly protected freedom does not enjoy the usual presumption of constitutionality; on the contrary, the state's subordinating interest in the regulation must be compelling * * * and the statute bears 'a substantial burden of justification' * *" Breen v. Kahl, supra, 296 F.Supp. at 706. Cf. McLaughlin v. Florida, 379 U.S. 184, at 196, 85 S.Ct. 283, 13 L. Ed.2d 222 (1964), NAACP v. Alabama ex rel. Flowers, 377 U.S. 288, at 307, 84 S.Ct. 1302, 12 L.Ed.2d 325 (1964), and Cantwell v. Connecticut, 310 U.S. 296, at 304, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).

Another excellent statement of this constitutional yardstick is found in Bates v. City of Little Rock, 361 U.S. 516, at 524, 80 S.Ct. 412, at 417, 4 L.Ed. 2d 480 (1960).

"Where there is significant encroachment upon personal liberty, the State may prevail only upon showing a subordinating interest which is compelling." Cf. *Griswold,* supra, 381 U.S. at 497 and 504, 85 S.Ct. 1678 and Olff v. East Side Union High School District, 305 F.Supp. 557, at 559 (N.D. Calif.1969).

Hence, for a state to impair a person's freedom to present himself to the world physically in the manner of his choice, absent a compelling and overriding interest,

"would offend a widely shared concept of human dignity, would assault personality and individuality, would undermine identity, and would invade

human 'being': It would violate a basic value implicit in the concept of ordered liberty, Palko v. Connecticut, 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937)." *Breen,* supra, 296 F.Supp. at 706. Cf. Powell v. Alabama, 287 U.S. 45, at 67, 53 S.Ct. 55, 77 L.Ed. 158 (1932), and Lucia v. Duggan, 303 F.Supp. 112, at 117 (D. Mass.1969).

No regulation concerning hair would be supportable only upon the basis of the personal taste of a school administrator, nor would an administrator's *ipse dixit* be sufficient to sustain a haircut requirement. Cf. *Richards,* supra, 304 F.Supp. at 454. While the Pittsburg regulation lacks the specificity of some such rules of personal appearance, it is a regulation that has been formally and authoritatively established, the existence and applicability of which is well-understood and acknowledged. The Pittsburg High School regulation, as set out in the Student Handbook, provides as follows:

"Boys will keep themselves neatly shaved and will keep their hair cut neatly. Extra long sideburns, goatees, mustaches, and extra long hair are not considered neat." .

Dr. C. W. Thompson, Superintendent of the Pittsburg County Line Consolidated Independent School District, stated that the regulation was enforced to keep the hair of male students "not over the ears, off the collar, and out of the eyes * * *" This statement reflects the uniform interpretation of the regulation during the current school year, as well as previously. I observed at the hearing of this matter that these two plaintiffs' hairstyles violate the school authorities' consistent application of the regulation. By reason of the holding made in this decision, I do not deem it necessary to touch upon the question of the regulation's alleged vagueness or lack of definiteness.

■ Because of some ambiguity in the defendants' presentation and in order to give conclusive consideration to the validity of the regulation, an attempt

will be made to evaluate every rationally conceivable justification for its enforcement that I gleaned from the evidence. The arguments advanced for the necessity of the regulation may be delineated as follows: (1) preventing violence; (2) instilling discipline; (3) avoiding division; (4) acting *in loco parentis;* (5) promoting desirable characteristics and conditions; (6) eliminating disruption; and (7) obviating distraction.

First. Testimony elicited from Dr. Thompson can be understood to mean that Jimmy Rumsey had been verbally harassed and indirectly threatened by other students because of Rumsey's long hair and that violence might be the outcome. The implicit argument of the defendants that the plaintiffs' constitutional right to choose their own hair style may be abridged because threats of violence can be summarily disposed of.

> "[I]n our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right of freedom of expression. Any departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear. Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk, Terminiello v. Chicago, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949); and our history says that it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society." *Tinker,* supra, 393 U.S. at 508–509, 89 S.Ct. at 737. Cf. *Griffin,* supra, 300 F.Supp. at 63; University Committee to End War in Viet Nam v. Gunn, 289 F.Supp. 469, at 474 (W.D.Tex.1968) (3-judge court), dism. for want of jurisd. 399 U.S. 383, 90 S.Ct. 2013, 26 L.Ed.2d 684 (1970), and United States v. United States Klans, Knights of Ku Klux Klan, Inc., 194 F.Supp. 897, at 906 (M.D.Ala.1961). See also Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5, 19 (1958).

That the *Terminiello* principle is apropos to the present issue is illustrated by the example cited by Zechariah Chafee, Jr., Free Speech in the United States, Harvard University Press, 1964, Pages 151–152.

> "This breach of the peace theory is peculiarly liable to abuse when applied against unpopular expressions and practices. It makes a man a criminal simply because his neighbors have no self-control and cannot refrain from violence. The *reductio ad absurdum* of this theory was the imprisonment of Joseph Palmer, one of Bronson Alcott's fellow settlers at 'Fruitlands,' not because he was a communist, but because he persisted in wearing such a long beard that people kept mobbing him, until law and order were maintained by shutting him up. A man does not become a criminal because some one else assaults him, unless his own conduct is in itself illegal or may be reasonably considered a direct provocation to violence."

Second. Dr. Thompson also contended, in effect, that the hair regulation should be sustained merely because it was a rule duly approved by legitimately constituted authority.

> "If such an argument were accepted, then any rule, no matter how arbitrary, capricious or abhorrent to our democratic process, could be justified by school officials." *Sims,* supra, 307 F.Supp. at 488–489. Cf. *Breen,* supra, 296 F.Supp. at 708, 419 F.2d at 1038.

Certainly, the young people of our nation will not be imbued with a sense of self-discipline and an understanding of legitimate authority by the imposition of an arbitrary code of personal appearance based on the restricted standards of taste held by some of their elders.

> "Of course, rational discipline has a value, and there are circumstances in

which the young must be taught the worth of conformity as well as the worth of individuality. But an attempt to impose conformity for the sake of conformity, or merely to accord with a principal's prejudices is not entitled to prevail over the personal liberty of a student to choose his hair style." *Richards*, supra, 304 F.Supp. at 454. Cf. *Calbillo*, supra, 305 F.Supp. at 862.

Third. In a similar vein, the defendants asserted that the majority of students and of the whole community disapprove of long hair and therefore these plaintiffs should be forced to trim their locks.

"Certainly the democratization of American life has not come to the point where every whim of the majority may be enacted into a mandate for all to follow. If so, then the Bill of Rights is for naught." *Calbillo*, supra, 305 F.Supp. at 861 (Footnote 4).

The idea that so-called deviant hair styles creates an undesirable separateness is without merit. Not only is the innate separateness caused by unique physiognomies, intellects, and personal and family backgrounds a natural and desirable condition, but also most school activities—curricular and extra-curricular—create a certain separateness. Indeed, our public schools should be the epitome of

"the constitutional premise * * * that 'from different tones comes the best tune.' Heraclitus frag. 8, Jeagar Paideia (1939) I, 18. They illustrate our national motto E PLURIBUS UNUM." *Richards*, supra, 304 F.Supp. at 453. Cf. Chapter 3 of John Stuart Mill's "On Liberty", supra, Pages 293–302.

"Our collective oneness with our country must not be permitted to obscure our individual inviolability—'the right (of each of us) to be let alone.'" Law In A Changing America, supra, Page 55.

Fourth. The defendants also maintained that the school has a right, even a duty, to act *in loco parentis*. Disposition of this contention does not necessitate any attack upon the general premise; it only needs to be pointed out that in the case before the court, as in *Breen*, supra, 419 F.2d at 1037–1038,

"the students' parents agree with their children that their hair can be worn long and because it would be impossible to comply with the long hair regulation during school hours and their parents as to hair length outside of school, in the absence of any showing of disruption, the doctrine of 'in loco parentis', has no applicability." Cf. *Westley*, supra, 305 F.Supp. at 710.

Moreover, as one court has noted,

"[t]he rule here has effect beyond school, so were a school to prohibit a boy attending school with no shirt and bare to the waist, if he desires to go bare waisted in life at home or beyond the school he may take off the shirt as he leaves the school grounds. Such is not the case with hair. * * The hair restriction * * * invades private life beyond the school jurisdiction." *Westley*, supra, 305 F. Supp. at 713.

Fifth. The school authorities further contended that hair style regulations are necessary for the cultivation of various desirable characteristics and conditions. The objective of developing habits of good grooming, laudable in itself, seems misdirected, however, when its achievement is sought by requiring hair to be trimmed to a certain length. Cf. *Westley*, supra, 305 F.Supp. at 710. These present plaintiffs certainly appeared neat and well-groomed in court. The suggestions, not made directly in this case, that short hair is necessary for good health and cleanliness and that long hair on males inherently endangers the safety of the wearers and their fellows in extra-curricular activities are belied by the hair styles of most females. Cf. *Westley*, supra, 305 F.Supp. at 710,

*Calbillo*, supra, 305 F.Supp. at 861, and Cash v. Hoch, 309 F.Supp. 346, at 348 (W.D.Wisc.1970). The connected argument that the wearing of hair styles differing from those of the majority somehow impedes the wearers' educational attainments is simply not supported by the evidence—nor can this court imagine how it could be. Dr. Thompson's assertion that the average of the student body dropped half a letter grade last year as the result of excessive long hair is readily contravened by the fact that newly integrated Negro students had an average achievement level of one and a half to two years less than their white classmates.

■ Sixth. Of course, if the behavior of students is disruptive of the decorum necessary for the maintenance of an orderly learning environment, corrective action may be taken. But who are these long-haired pubescent males? Are they some kind of immoral scofflaws whom a trip to a barber shop will turn into obedient automatons? The record does not reveal such to be the case. The defendants seem to argue, errantly subscribing to the modern shibboleth that all long-haired or bearded males are "hippies", that the plaintiffs' tonsorial styles inevitably mark them as troublemakers. Mere conclusory allegations by defendants are not a sufficient constitutional basis for the regulation. Cf. *Calbillo*, supra, 305 F.Supp. at 861 (Footnotes 5 and 6), and *Sims*, supra, 307 F.Supp. at 489. See also Lansdale v. Tyler Junior College, 318 F.Supp. 529 (E.D.Tex.1970).

"The touchstone for maintaining such regulations is the demonstration that they are necessary to alleviate interference with the educational process." *Griffin*, supra, 425 F.2d at 203. Cf. *Sims*, supra, 307 F.Supp. at 488.

The defendants simply have not met their burden; for they have established no demonstrable causal relation between long hair and disruption of the educational process. Specifically, I find that the plaintiffs' long hair caused no material or substantial interference with the requirements of appropriate discipline in the Pittsburg High School. Also, I find that alleged disruptions alluded to by defendants consisted merely of the disturbances caused by the school administration's enforcement of the regulation and harassment of those wearing long-hair. Cf. *Breen*, supra, 296 F.Supp. at 708 (Footnote 8). Finally, I find that during the previous year, when more students wore hair as long as that in issue here, there was no significant or identifiable disruption by reason thereof. To paraphrase Justice Brandeis, concurring in Whitney v. California, 274 U.S. 357, at 378, 47 S.Ct. 641, 71 L.Ed. 1095 (1927), among free men the appropriate deterrents for the prevention of anti-social conduct are education and punishment for violations of legitimate standards of behavior, not infringements on an individual's attempt to define his personal identity. For example, if boys with long hair do comb their hair during class, they, of course, may be disciplined for such behavior. Cf. *Griffin*, supra, 300 F.Supp. at 63.

"It is * * * acts that should be prohibited, not the expression of individuality * * * " *Ferrell*, supra, 392 F.2d at 706 (Tuttle, J., dissenting).

"In a series of decisions this Court has held that, even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. The breadth of legislative abridgment must be viewed in the light of less drastic means for achieving the same basic purpose." *Shelton*, supra, 364 U.S. at 488, 81 S.Ct. at 252.

Seventh. Finally, the defendants urge that the plaintiffs' hair styles may be proscribed because they are distracting to other students. It may be wondered whether it is actually the administrators, and not the great majority of the students, who are subject to distraction by variant hair styles. Cf. *Breen*, supra, 296 F.Supp. at 709 (Footnote 9).

But are we really to believe that the appearance of a few long-haired males will topple the pillars of the educational structure of our public schools? If so, then fragile indeed is that structure. It may be conceded that long hair on a few students might be distracting, though how long those with long hair will remain in the minority among either their contemporaries or their elders, given today's fashion trends, may be doubted. But a 275 pound football tackle, a 6 foot, 8 inch basketball center, or a comely young woman may also be distracting. Are they to be banned? A deformed survivor of polio, a paraplegic accident victim, a blind child—these, too, may stir up emotions. But on that account, are they to be segregated? Furthermore, defendants could provide no credible evidence that long-haired students were unusually distracting to their classmates. Evidence presented concerning problems about the wearing apparel of female students simply is not relevant.

While the affectation of an atavistic or epicene hairstyle does not seem to me to be a particularly meaningful way of expressing one's personality, I maintain that it is not the responsibility of this or any other court to impose its personal predilections on the populace of this nation. It should not need repetition that this decision is limited to the matter in issue—the regulation governing the length and style of the hair of plaintiffs who attend a public high school. But it does bear emphasizing that in recognizing the significance of the treasured right to be let alone,

"I do not see how this broadens the authority of the Court; rather it serves to support what this Court had been doing in protecting fundamental rights." *Griswold,* supra, 381 U.S. at 492–493, 85 S.Ct. at 1686 (Goldberg, J., concurring).

Let me note that I do not impugn the motives of the defendants; however, it is well to remember the words of Justice Brandeis, dissenting in *Olmstead,* supra, 277 U.S. at 479, 48 S.Ct. at 572:

"Experience should teach us to be most on our guard to protect liberty when Government's purposes are beneficient. Men born to freedom are naturally alert to repel invasion of their liberty by evil-minded rulers. The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding."

It is, therefore, ordered that the plaintiffs' motion for a preliminary injunction, pending final hearing shall be, and it is hereby, granted.