**Dan SULLIVAN, by next friend Daniel H. Sullivan, Michael Fischer, by next friend George David Fischer, et al.**

v.

**HOUSTON INDEPENDENT SCHOOL DISTRICT et al.**

**Civ. A. No. 69-H-266.**

United States District Court,
S. D. Texas,
Houston Division.

June 23, 1971.

Robert Hall, Eric Nelson, Dixie, Wolf & Hall, Houston, Tex., for plaintiffs.

William Key Wilde, L. Kelly Frels, Bracewell & Patterson, Houston, Tex., for defendants.

## MEMORANDUM OPINION AND ORDER

SEALS, District Judge.

This action is before the court on movant's motion for an order requiring respondents to show cause why they should not be adjudged in contempt of this court for respondents' alleged violation of a permanent injunctive decree issued by the court under date of December 30, 1969; further, on movant's motion for supplementary injunctive relief to effect the better implementation of the court's previous injunction; and further, on movant's motion for damages sustained as a result of respondents' allegedly contemptuous conduct.

### Summary of Facts

In 1969, Dan Sullivan and Michael Fischer, two 12th grade students of the Houston Independent School District, were suspended from Sharpstown Junior-Senior High School because of their involvement in the production and distribution of a certain publication which they called the *Pflashlyte* and which criticized school officials. Shortly after their suspension, the students filed a complaint in this court pursuant to 42 U.S.C. § 1983, in which they sought an order compelling their reinstatement, and in which they further sought, both for themselves and as representatives of the class of persons aggrieved, injunctive and declaratory relief against certain regulations of the Houston Independent School District, all pursuant to 28 U.S.C. § 2201 and Rule 23, Federal Rules of Civil Procedure.

After a lengthy trial the court, in a Memorandum Opinion under date of November 17, 1969, 307 F.Supp. 1328 (S.D. Tex.1969), made, *inter alia*, the following findings of fact and conclusions of law:

1. That the minor plaintiffs, Sullivan and Fischer, qualified as proper representatives of the class whose interest they sought to protect;

2. That minor plaintiffs were disciplined because school officials disliked the contents of their publication and that discipline for such reason is constitutionally impermissible;

3. That the procedures utilized to effect the suspension of minor plaintiffs failed to provide them with those minimal safeguards of due process mandated by the fourteenth amendment to the United States Constitution;

4. That the School District's regulation under which minor plaintiffs were suspended[1] was constitution-

---

1. The regulation stated as follows:
 The school principal may make such rules and regulations that may be necessary in the administration of the school and in promoting its best interests. He may enforce obedience to any reasonable and lawful command.

ally void for both "vagueness" and "overbreadth".

On December 30, 1969, this court issued its "Permanent Injunction Decree and Declaratory Judgment," which, after redressing the particular grievances of the minor plaintiffs, Sullivan and Fischer, granted the following relief to all members of the class of persons which Sullivan and Fischer had been adjudged to represent:

The named defendants, their successors in office, and their present and future agents, servants and employees and all persons in active concert or participation with them who receive actual notice of this permanent injunction decree are hereby permanently enjoined and restrained from promulgating, maintaining or enforcing any regulation, plan or policy designed to prohibit absolutely the publication or distribution of all newspapers or other similar expressions of opinion or statements of fact by covered students on school premises. In the event that the defendant trustees, or their successors in office, shall determine to promulgate, maintain or enforce or cause the promulgation, maintenance or enforcement of any regulation, plan or policy designed or calculated to regulate the production or distribution of newspapers or other similar written expressions of opinion or statements of fact by covered students on school premises, they and each of them are permanently restrained and enjoined from doing so except by written rule to be furnished to each covered student to which it applies, or to be posted on a bulletin board or other place accessible to the covered students at each school so they may know or have notice of the existence thereof. The said defendants and their successors in office are further permanently restrained and enjoined from the promulgation, maintenance and enforcement of any such rule unless the following conditions are met:

1. The rule must be specific as to places and times where possession and distribution of published materials is prohibited.

2. The rule must be understandable to persons of the age and experience of covered students.

3. The rule must not prohibit or inhibit conduct which is orderly, peaceful and reasonably quiet and which is not coercive of any other person's right to accept or reject any written material being distributed subject to the rule.

4. The rule may prohibit such distribution at times and in places where normal classroom activity is being conducted. Such rule may not prohibit such distribution at other times and places unless such prohibition is necessary to prevent substantial and material interference with or delay of normal classroom activity or normal school function. As used herein, "normal classroom activity" means organized educational activity of students under the direct supervision of a teacher or a school administrator. Such phrase includes student activity in library areas, physical education classes, whether conducted indoors or outdoors, official assemblies and other similar gatherings. "Normal school function" means such activities as athletic contests, band concerts, school plays and scheduled on-campus lunch periods. Further, the peaceful, orderly, non-coercive distribution of written material before the commencement of classes in the morning and after the conclusion of classes in the afternoon by students lawfully on or off the premises of the school in which they are enrolled shall not be prohibited unless, under the circumstances, such distribution substantially and materially interferes with some normal classroom activity or normal school function as those phrases are hereinabove defined.

5. The rule must not subject any covered student to the threat of discipline because of the reaction or response of any other person to the written material, provided, however, that defendants and their successors in office may prohibit or punish the publication or distribution of obscene material or of libelous material for which a cause of action may exist in some person.

It is further ordered, adjudged, and decreed that the defendants and their successors in office, and their present or future agents, servants and employees, are permanently restrained and enjoined from imposing substantial discipline upon any covered student who is subject to the regulatory authority of defendants, unless they shall observe and follow the procedures hereafter set forth. "Substantial discipline" as herein used is hereby defined to include any expulsion or suspension from classes or attendance at school for more than three days, and any expulsion or suspension from classes or attendance at school which is not specifically limited to three days or less at the time of imposition. The procedures herein required shall include at least the following:

1. The covered student and at least one of his parents or his guardian shall be furnished, either in person or by mail directed to the student's last known address, with written notice of the charges and of the nature of the evidence against such covered student.

2. The covered student and at least one of his parents or guardian shall be offered a formal hearing after sufficient time to prepare a defense or reply, at which hearing evidence in support of the charge shall be presented by school officials and the affected covered student or his parent or guardian shall have ample opportunity to present any defense or reply.

3. The decision of school officials to impose such discipline shall be based upon a dispassionate and fair consideration of substantial evidence that the covered student committed the acts for which discipline is to be imposed and that such acts are in fact a proper reason for such discipline.

Pursuant to the plaintiffs' prayer for declaratory relief, it is the judgment of this court that:

1. That the First and Fourteenth Amendments to the Constitution of of the United States apply to the administration of the public school by the defendants, their successors in office, their agents, servants and employees and inure to the benefit of the class of covered students as that term is herein defined, now or hereafter enrolled in such schools. Therefore, the absolute prohibition of all publication and distribution of printed and written material by students is unconstitutional.

2. The Fourteenth Amendment to the United States Constitution prohibits the defendants from imposing discipline upon covered students on the basis of claimed violations of rules or regulations which are so vaguely worded that students subject to such rules and regulations, although conscientiously desiring of abiding by them, would nevertheless be in doubt about the boundary line between permitted and prohibited conduct.

3. For both of the foregoing reasons defendants' rule or regulation as follows:

THE SCHOOL PRINCIPAL

The school principal may make such rules and regulations that may be necessary in the administration of the school and in promoting its best interests. He may enforce obedience to any reasonable and lawful command.

is hereby declared to be null and void upon its face. Further, it was stipulated by the parties that this rule is the "only written rule or regulation of the Houston Independent School District concerning the private pub-

lication and distribution of written material by students in secondary schools of newspapers which are not published in the name of any school and which do not purport to be published under the auspices of any school". And that "this rule is interpreted by responsible officials of the Houston Independent School District to prohibit any such publication [of the type described in the just quoted stipulation] which is either 'not in the best interests of the school' or which is 'disruptive.'" And that the foregoing rule was "construed by responsible officials of the Houston Independent School District to prohibit the type of publication and distribution engaged in by Michael Fischer and Dan Sullivan in February and March of 1969."

Subsequent to the entry of this court's permanent injunction, the Board of Trustees of the Houston Independent School District formulated new policies regarding student distribution of printed matter. The Board appointed a committee of business and professional leaders, students, teachers and attorneys, whose task it was to recommend policies that would conform to this court's injunction.[2] Those recommendations were duly adopted by the Board of Trustees.[3]

2. The working committee was composed of some of the most outstanding residents of the Houston area: two attorneys, W. Amon Burton, Jr., and John Barnhart; Mrs. Morris Mills, president of the Parents' League of Houston; Mrs. Jeff Montgomery, Harris County Drug Abuse Program; Mrs. Charles Rives, president of the City Council Parent-Teachers' Association; Rev. Hunter Morriss, executive director of Houston Metropolitan Ministries; and two students, Miss Arlene Rachal, Wheatley High School, and Larry Davidhizer, Lamar High School. Attorney Marc Grossberg served the committee as special counsel.

The court takes notice that the School Board received first place in the National School Board award program while this case was under submission. This citation demonstrates the exceptional ability of the Superintendent of Schools, Dr. George Garver, and the excellent achievements of the School Board under the leadership of its chairman, Dr. George Oser.

3. The complete text of the new Regulation on Student Publications is as follows:

Student participation in the publication of school newspapers, yearbooks, literary magazines, and similar publications is encouraged by the Houston Independent School District as learning and educational experiences. These publications have qualified faculty advisors and strive to meet high standards of journalism. Opportunities for a broad spectrum of opinions shall be provided.

In addition to school-sponsored publications, students are entitled to express in writing their opinions and may distribute handwritten, duplicated, or printed materials on school premises or at school-sponsored activities at other locations in accordance with the following conditions and procedures:

1. A copy of the publication must be given to the principal, who may take up to one school working day for the purpose of reviewing such publication before its general distribution. If, in the opinion of the principal and the attorneys employed by the Houston Independent School District, the publication contains libelous or obscene language or advocates illegal action or disobedience to published rules on student conduct adopted by the Board of Education, the principal shall notify the individual or sponsors of the publication that it cannot be distributed on the school premises. Distribution shall not be prohibited because the publication contains the expression of any idea, popular or unpopular.

2. A time and place for distribution must be cooperatively established with the principal, except that in any event the distribution can take place before and after regular school hours on school premises.

3. The publication cannot be sold on school premises.

4. The publication must contain the names of the individual contributors, editors and publishers.

Distribution on school premises of material consisting primarily of commercial advertising or literature advocating the nomination or election of any person for public office is expressly prohibited.

Distribution of printed material off school premises will be subject to the foregoing rules when the manner of distribution is calculated to and in fact does result in possession by students on school premises. This includes distribution at places adjacent to the school premises in the morning before normal classroom activity has begun.

On the morning of October 20, 1970, prior to the beginning of classes, Paul Kitchen, a junior at Waltrip Senior High School, and a member of the class of persons protected by the court's injunction and declaratory judgment of December 30, 1969, was standing near an entrance to, but not actually on the property of, Waltrip High School. Paul was selling SPACE CITY!, a newspaper in general circulation in Harris County. Most of Paul's customers were students coming onto the Waltrip campus.

After Paul had made a number of sales, he was confronted by Gordon Cotton, the principal at Waltrip, who bought a copy of the newspaper, read a portion of the second page, and informed Paul that the latter was violating School Board policy concerning the distribution of literature on campus. Later that morning, Paul was called in for a conference with Mr. Cotton, who told Paul that he was being suspended pending a conference with his parents, and gave Paul a suspension card on which to obtain the signatures of his teachers. Mr. Cotton also telephoned notice of the suspension to Paul's father, Mr. A. P. Kitchen, and requested that Mr. Kitchen come to the school for a conference. Mr. Kitchen replied that he would be unable to attend such a meeting until the following Monday, October 26, and the conference was then scheduled for that date. Meanwhile, Paul returned to Mr. Cotton's office to deliver the signed suspension card; as he was leaving, Paul spoke the word "goddamn" in a loud voice and slammed the door to Mr. Cotton's office.[4]

Paul returned to the Waltrip campus several times during the following week, and was reprimanded on each occasion by a teacher or administrator because of his presence on campus while under suspension. On the morning of October 26, Paul was again selling SPACE CITY! near the entrance to Waltrip. Informed of this new defiance, Mr. Cotton rushed to the scene and presented Paul with a copy of the School Board regulations regarding student distribution of literature. Mr. Cotton threatened Paul with arrest if he persisted in violation of Board policy. Thereupon, Paul used the word "fuck" in the presence of Mr. Cotton; Mr. Vann, a teacher accompanying the principal; and a number of students who were observing the confrontation. At this point, the parties dispute the precise content of Paul's language, but all agree that he employed the common Anglo-Saxon vulgarism for sexual intercourse.

Paul was arrested, taken to the police station, and later released. Mr. Kitchen, upon being apprised of the turn of events, decided to forego his scheduled meeting with Mr. Cotton and instead to seek legal assistance. On this same date, October 26, Mr. Cotton mailed to Paul's parents a written notification of Paul's suspension for the remainder of the semester.[5]

---

4. Although respondents have repeatedly emphasized movant's use of profanity in the presence of the principal and others, it is clear that Mr. Cotton had already determined, at the time movant first used profanity in his presence, to suspend movant for an indefinite period, i. e., until one of his parents met with the principal.

5. The letter of suspension reads as follows:
 Dear Mr. Kitchen:
 Paul has been suspended from school for violation of School Board policy regarding school publications and using profanity in the presence of my secretary, Mrs. Winship, and my clerk, Mrs. Lynn, and me. A copy of the rules regarding student publications is posted in each room and on the main bulletin boards around the building. I regret that I have to suspend Paul, and I want to notify you of the proper procedure.
 At your request I will be glad to have a meeting in my office, and you may have witnesses and present evidence at the hearing to refute the allegations of misconduct. Following is a quote from Board policy:
 "A student or his parent or guardian who desires to be assisted at the hearing of any disciplinary proceeding may be accompanied by an adult person who may represent and assist him in the proceedings. If a parent or guardian is unable to attend, he may designate an adult

On October 29, Mr. Cotton conducted a "hearing" in his office to determine the propriety of the suspension action. Paul was accompanied by his attorney, Mr. Eric Nelson. Mr. Cotton affirmed his previous decision to suspend Paul, on the basis of Paul's violation of School Board policy and for the additional reason of Paul's use of language deemed unbecoming by Mr. Cotton.

Mr. Cotton's decision was appealed to an assistant superintendent, Mr. Britton Ryan, and on November 9, that official conducted an evidentiary hearing at which Paul, his father, and his attorney were present. Mr Ryan upheld Mr. Cotton's decision, and Mr. Ryan's ruling was in turn reviewed and sustained by the Deputy Superintendent for Secondary Schools and by the Superintendent for Instruction and Administration.

On November 23, Paul and his father initiated the present action. The following day, this court issued a temporary restraining order directing that Paul be allowed to return to classes pending a hearing on the merits. Paul returned to school on November 25. The court suggested that movant exhaust his administrative remedies by appealing to the Board of Trustees. The Board held a formal hearing, complete with attorneys, witnesses and court reporter, on December 16. The Board affirmed Mr. Cotton's decision to suspend Paul, but reduced the penalty from a suspension for the entire fall semester to a suspension from October 20 to November 25,[6] plus an additional two weeks.[7]

I

## The Nature of the Proceeding

At the outset, it is necessary briefly to consider the nature of the instant proceeding. Respondents emphasize the language of the court in its previous injunction, which declared that respondents are prohibited from making and enforcing any regulation "unless the following conditions are met." Respondents contend that, by enacting their revised regulations, they have complied with all terms of the court's injunction and are therefore released from its further operation.

The court would be remiss in its duty to uphold the law and the Constitution, were it to allow respondents so easily to remove themselves from the operation of the injunction. But the reply to this semantic quibbling requires no jurisdictional overreaching. For, as the court will demonstrate below, respondents have not as yet complied with the terms of the previous injunction. Such conclusion obviates the necessity of examining the technical effect of "unless," since the conditions precedent of that "unless" were never fulfilled.

Respondents have also declared that the instant proceeding is not properly within the realm of contempt, and is rather in the nature of a new and independent proceeding. Such a view is mistaken. Movant here seeks to have respondents declared in contempt of court for allegedly violating the court's injunction in a manner inuring to movant's injury. If, in rendering a decision on the contempt issue, the court finds that its

---

to represent the student. The Houston Independent School District may require evidence of the appointment of any such representative."

I will be glad to talk with you any time during school hours. Enclosed is a copy of regulations which are posted in this school. I call your attention especially to the paragraph marked in red.

Sincerely yours,
/s/ Gordon M. Cotton

6. The date on which Paul re-entered school pursuant to the court's temporary restraining order of November 24, 1970.

7. On December 23, 1970, the court, following a prolonged controversy, ordered respondents to allow Paul to make up the work he had missed during the period of his suspension, but reserved the question of credit for this work pending a decision on the merits of the case.

injunction contains provisions that are subject to frequent misconstruction and that are likely to necessitate further court intervention unless clarified, the court reserves the right, and so informed both parties at the outset of this proceeding, to promulgate an additional and supplementary injunction that will better enable all parties to follow the court's instructions. The court specifically declines, however, to modify any portion of its previous injunction.

## II

### The Crisis of Education

In the past decade, the public school has become a battleground, dominated by the effort to achieve the unitary school system,[8] which struggle has increasingly yielded the spotlight to the demands of students for full recognition of their rights as citizens of the United States. Many students have witnessed a slow but steady confirmation of those basic American liberties which non-students take for granted. In most instances, however, the school has not quietly or voluntarily yielded up its enormous power over the lives of its students. Sometimes, progressive boards of education have acted to redress the students' ancient grievances. But most often, and with increasing frequency, the federal court has been the only institution willing to guarantee the constitutional rights of students.

Such buck-passing has engendered fear and resentment among parents, teachers, and all levels of the school hierarchy. It has, however, provided school officials with a convenient scapegoat on which to blame their own deficiencies.

Charles Silberman has written that "the most important characteristic schools share in common is a pre-occupation with order and control." Charles Silberman, Crisis in the Classroom (New York: Random House, 1970), at 122. Teachers and administrators speak of a crisis of authority, a breakdown of discipline in the public school, generated, it is said, by the controls imposed on them by courts totally unacquainted with the day-to-day problems that confront school officials. The panacea for permissiveness is power to the principal.

There is much to suggest, however, that the solution to the crisis of education may not be so deceptively simple. More control, according to George Dennison,[9] is an inadequate if not self-defeating response:

"The crisis in public education, like the hastening dissolution of other of our social institutions, creates anxiety and doubt, and we respond as anxious people do: we try to impose order by force, imagining that if we can obliterate the symptoms, we will have cured the disease. We speak increasingly of control, as if we feared that everything would collapse into nothing if we let loose our (illusory) hold on things. And so I have been urging one simple truth through all these pages: that the educational function does not rest upon our ability to control, or our will to instruct, but upon our human

---

8. See this court's recent decision in Cisneros v. Corpus Christi Independent School District, 324 F.Supp. 599 (S.D. Tex., 1970).

9. George Dennison is perhaps the most articulate representative of a relatively new group of critics of education, who largely dispense with theory and instead write about their experiences in the classroom, usually with ghetto or underprivileged children. Their ranks include John Holt *(How Children Fail, How Children Learn, The Underachieving School)*; Herbert Kohl *(36 Children, The Open Classroom)*; Jonathan Kozol *(Death at an Early Age)*; and James Herndon *(The Way It Spozed To Be, How to Survive in Your Native Land)*.
Another highly informative work, *Pygmalion in the Classroom*, by Harvard psychologist Dr. Robert Rosenthal and South San Francisco principal Dr. Lenore Jacobson, demonstrates the operation of the principle of the self-fulfilling prophecy —the idea that expecting a result can cause that result. As applied to the classroom, the principle means that a teacher's expectations contribute significantly to his pupil's achievements.

nature and the nature of experience." George Dennison, *The Lives of Children* (New York: Random House, 1969), at 246.

The result of such efforts to control students is to defeat creativity—the purported goal of the educational system:

"The function of education has never been to free the mind and the spirit of man, but to bind them; and to the end that the mind and spirit of his children should never escape Homo sapiens has employed praise, ridicule, admonition, accusation, multilation, and even torture to chain them to the culture pattern. Throughout most of his historic course Homo sapiens has wanted from his children acquiescence, not originality. Contemporary American educators think they want creative children, yet it is an open question as to what they expect these children to create. * * * It stands to reason that were young people truly creative the culture would fall apart, for originality, by definition, is different from what is given, and what is given is the culture itself. From the endless, pathetic 'creative hours' of kindergarten to the most abstruse problems in sociology and anthropology, the function of education is to prevent the truly creative intellect from getting out of hand." Jules Henry, "In Suburban Classrooms," Beatrice and Ronald Gross, eds., *Radical School Reform* (New York: Simon & Schuster, 1969), at 77–78.

Charles Silberman asks how a group can

"'achieve enough maturity to keep itself under control' if its members never have an opportunity to exercise control? Far from helping students to develop into mature, self-reliant, self-motivated individuals, schools seem to do everything they can to keep youngsters in a state of chronic, almost infantile, dependency. The pervasive atmosphere of distrust, together with rules covering the most minute aspects of existence, teach students every day that they are not people of worth, and certainly not individuals capable of regulating their own behavior." Silberman, supra, at 134.

Furthermore, this preoccupation with control infects the entire system:

"The school board has no faith in the central administration, the central administration has no faith in the principals, the principals have no faith in the teachers, and the teachers have no faith in the students * * * In such a system it seems natural not to give the principal of a school control over his budget, nor to give the teachers control over their syllabus, and not to give the students control over anything. Distrust is the order of the day." Silberman, supra, at 133.

Such an atmosphere may provide an appropriate model for an authoritarian police state, but it is hardly conducive to the realization of a system that generates free men. Years ago, the Supreme Court recognized the principle that school authorities may not compel students to salute the flag of the United States, West Virginia State Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). Even at that early date, two decades before the first stirrings of youthful protest began to arouse the fears and indignation of their elders, Mr. Justice Jackson confirmed the libertarian ideal that no organ of the state is immune to constitutional scrutiny:

"The Fourteenth Amendment, as now applied to the States, protects the citizen against the State itself and all of its creatures—Boards of Education not excepted. These have, of course, important, delicate, and highly discretionary functions, but none that they may not perform within the limits of the Bill of Rights. That they are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." *Barnette*, supra, at 637, 63 S.Ct. at 1185.

In 1969, the Supreme Court extended to public school students the full panoply of first amendment rights, Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). Finding that a regulation which prohibited students from wearing black armbands during school hours to publicize their objections to the war in Vietnam violates their right to free speech, Mr. Justice Fortas declared that

"In our system, state-operated schools may not be enclaves of totalitarianism. * * * The Constitution says that Congress (and the States) may not abridge the right to free speech. This provision means what it says." *Tinker*, supra, at 511–513, 89 S.Ct. at 739–740.

Since *Tinker*, federal courts have been deluged with a plethora of cases asserting the newly-recognized rights of students. Perhaps a majority have dealt with the highly controversial area of student dress and hair style. Although a large number of courts seem now to have affirmed the unrestricted right of each student to govern his personal appearance,[10] and an increasing number of boards of education have voluntarily bowed to the ideals of personal integrity or changing fashion, the advocates of judicial interference in this area have been obliged to invoke that ethereal "right of privacy" which sprang full-blown from the head of Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), the "forgotten

ninth amendment," or, most often, the due process clause.

In the instant case, there can be no discomfort to strict constructionists who prefer their constitutions to be literal. No right is more clearly within the protection of the first amendment, whose provisions *Tinker* has now extended to the public school, than the freedom to distribute printed matter. Throughout our constitutional history, only three exceptions have been permitted to limit this freedom, and the exceptions themselves have been narrowly construed. Two of them, obscenity and libel, were written into this court's permanent injunction. The third prohibits speech which constitutes a "clear and present danger."[11]

The interpretation of two of these three limitations, obscenity and "clear and present danger," provides the matrix for the controversy confronting this court. Movant asserts that both the School Board and respondent Cotton have interpreted the court's injunction in a manner that is constitutionally invalid and that, in addition, the Board has added to the permissible regulations several nuances that extend well beyond the court's mandate.

### III

### Why Paul Kitchen Was Suspended

### I.

### Prior Restraint

■ Movant's principal attack on the School Board's regulation, as opposed to

10. Since January 1, 1971, courts have ruled favorably to student complainants in Martin v. Davison, 322 F.Supp. 318 (W.D. Pa., 1971); Lambert v. Marushi, 322 F. Supp. 326 (S.D.W.Va., 1971); Axtell v. LaPenna, 323 F.Supp. 1077 (W.D.Pa., 1971); Ordway v. Hargraves, 323 F.Supp. 1155 (D.Mass., 1971); and Watson v. Thompson, 321 F.Supp. 394 (E.D.Tex., 1971). The last of these decisions, by Judge Justice of the Eastern District of Texas, is perhaps the most lucid opinion yet to appear in the area of student rights. Dawson v. Hillsborough County, Florida School Board, 322 F.Supp. 286

(M.D.Fla., 1971), another thorough and thoughtful ruling in the student's favor, has been affirmed by the Court of Appeals for the Fifth Circuit within the past few days.

11. In the context of the public school, the *Tinker* decision defined "clear and present danger" as that which "materially disrupts classwork or involves substantial disorder or invasion of the rights of others." Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 513, 89 S.Ct. 733, 740, 21 L.Ed.2d 731 (1969).

respondent Cotton's interpretation of the regulation, focuses upon the requirement that a student who wishes to distribute non-officially sanctioned materials on or near campus [12] must submit.

"a copy of the publication * * * to the principal, who may take up to one school working day for the purpose of reviewing such publication before its general distribution."

Movant contends that such blanket prior restraint is permitted neither under the terms of this court's previous injunction, nor under the United States Constitution.

The court can discover no language in its previous injunction that would approve a practice rejected by the Supreme Court in 1931:

"The exceptional nature of its limitations places in a strong light the general conception that liberty of the press, historically considered and taken up by the Federal Constitution, has meant, principally although not exclusively, immunity from previous restraints or censorship." Near v. State of Minnesota ex rel. Olson, 283 U.S. 697, 716, 51 S.Ct. 625, 631, 75 L.Ed. 1357 (1931).

Prior restraint does, in fact, involve too great a risk that respondents will, unwittingly, violate that portion of the court's injunction which requires that the school regulation

"* * * not subject any covered student to the threat of discipline because of the reaction or response of any other person to the written material * * *"

The regulation authorizes the principal to prohibit distribution of any material, provided he obtains the agreement of

"the attorneys employed by the Houston Independent School District"

that

"the publication contains libelous or obscene language or advocates illegal action or disobedience to published rules on student conduct adopted by the Board of Trustees."

The possibilities of abuse inherent in such a regulation are numerous, and several of them are vividly reflected in the actual events that transpired in the case at bar. Mr. Cotton deemed the publication in controversy "obscene" before seeking or obtaining the opinion of attorney or layman, and with no regard for the legal definition of obscenity; respondents' attorneys have continued to label the publication "obscene." Furthermore, the regulations, although commendably limiting the principal's decision to "one school working day," [13] do not provide for any kind of adversary proceeding or right of appeal of a principal's decision that a publication is unacceptable. The court finds that the minimal safeguards provided by the regulation fail to obviate the risk that a publication will be scrutinized on the basis of its content, or that untrained laymen will misconstrue "obscenity" and "libel" in violation of a student distributor's first amendment rights.

In any event, prior restraint is an unnecessary and unacceptable amplification of the narrow restrictions contemplated by the court in its injunction. Prior restraint is so little favored by

---

12. The revised regulation states: "Distribution of printed material will be subject to the foregoing rules when the manner of distribution is calculated to and in fact does result in possession by students on school premises. This includes distribution at places adjacent to the school premises in the morning before normal classroom activity has begun."
The court considers as reasonable this aspect of the regulation, especially in view of the court's emphasis on disruption as a proper criterion, infra.

13. Because the most important aspect of a newspaper is its timeliness, even a 24-hour period may be too great. SPACE CITY!, at the time of these events, was published bi-weekly. The court, takes judicial notice that it now appears weekly. In the case of a daily, a 24-hour delay would completely destroy the newspaper's effectiveness. The point is that the regulation makes no distinctions based on frequency of publication.

the United States Constitution that respondents assume an extremely heavy burden in attempting to justify its imposition.[14] Like the court in Eisner v. Stamford Board of Education, 314 F. Supp. 832 (D.Conn.1970), we observe that

> "the defendants have not produced a scintilla of proof which would justify the infringement of the students' constitutional rights to be free of prior restraint in their writings." Id., at 835.

Respondents have completely failed to convince the court that the present situation at Waltrip High School or at any other school of the Houston Independent School District is sufficiently perilous to warrant the practice of blanket censorship.

> "* * * the risk taken if a few abuse their First Amendment rights of free speech and press is outweighed by the far greater risk run by suppressing free speech and press among the young." Eisner, supra, at 836.

### 2.

### Advocacy of Disobedience

■ Another of movant's objections focuses upon that aspect of the School Board's regulation which prohibits any publication which

> "* * * advocates illegal action or disobedience to published rules on student conduct adopted by the Board of Trustees * * *."

Such a provision was clearly not contemplated by the court's injunction and, indeed, stands in direct violation of the court's unequivocal statement that the regulation

> "* * * must not subject any covered student to the threat of discipline because of the reaction or response of

any other person to the written material * * *"

which statement then creates exceptions only for the categories of obscenity and libel. The only other permissible exceptions, treated below, concern the special emergency situation, in which the presence of highly volatile literature on campus might pose a "clear and present danger," and the situation in which substantial disruption is created by the presence of the publication, and school officials, after repeated good faith efforts, have proved unable to quell such disruption by discipline of those students who provoked the disturbance.

Special provision for these highly unlikely circumstances, however, cannot salvage respondent's blanket prohibition of all publications which "advocate illegal action or disobedience to published rules." The line separating advocacy of disobedience from mere approval is a fragile one, one whose drawing we should not entrust to the hands of laymen possibly overly zealous to protect their authority. In addition, respondents might well construe "illegal action" in a manner that would enable them to proscribe virtually any unfavored publication. An editorial recommending to draftees that they resist military induction is advocating "illegal action," but it is hardly of the kind that need concern school officials. In short, this particular aspect of the regulation does not satisfy the court's previous discomfort about rules which are vague and overbroad. The court finds that that portion of the School Board's regulation prohibiting the distribution of any publication which "advocates illegal action or disobedience to published rules on student conduct adopted by the Board of Trustees" is constitutionally void for vagueness and overbreadth, and further, is violative of the court's previous injunction.

---

14. The New York City and Philadelphia school systems do not permit prior restraint. The New York City rule is that "none of the literature * * * need be approved in advance by school officials."

The Philadelphia regulation states that "there shall be no prior censorship or requirement of approval of the contents or wording of such material * * *"

### 3.

### Blanket Ban on Sales

■ A third objection to the Board's regulations concerns the blanket ban on sale of newspapers before the commencement of classes in the morning. The court's previous injunction stated that

"the peaceful, orderly, non-coercive distribution of written material before the commencement of classes in the morning and after the conclusion of classes in the afternoon by students lawfully on or off the premises of the school in which they are enrolled shall not be prohibited unless, under the circumstances, such distribution substantially and materially interferes with some normal classroom activity or normal school function as those phrases are hereinabove defined."

Respondents, however, prohibit *all* sales before school, irrespective of "disruption." Such a blanket proscription is not a legitimate exercise of the Board's power to regulate the "time, place and manner" of distribution, and it is hereby declared to be void and of no effect.

### 4.

### Obscenity

Perhaps the major thrust of movant's attack concerns "obscenity." In this area, it becomes difficult to distinguish between the School Board regulation and Mr. Cotton's interpretation of that regulation. The court's injunction included "obscene material" within the limited category of items whose distribution the School Board and its agents may ligitimately prohibit and punish. The Board's regulation, however, preferred the term "obscene language," and it is largely upon the allegedly "obscene language" which he found in a particular issue of SPACE CITY! that respondent Cotton claims to have predicated his initial decision to suspend movant.

■ To require a distinction between "language" and "material" is not mere quibbling. For if the Board's regulation is meant to embrace "vulgarity" within the ambit of "obscene language," the regulation is clearly violative of the court's injunction. If, however, the Board understood the distinction between "vulgarity" and "obscenity," and meant to confine "obscene language" to that which appeals to a reader's prurient interest in sex, then it is Mr. Cotton's interpretation of the regulation, embracing the merely vulgar within the scope of "obscene language," which must fail. Whether the Board or the principal, however, bears the primary responsibility for the erroneous construction, respondents have failed to demonstrate that the publication in controversy is embraced within a proper definition of "obscene material."

The Supreme Court has recognized that the power of the state to control the conduct of minors reaches beyond the scope of its authority over adults, even where there is an invasion of constitutionally protected freedoms, Ginsberg v. New York, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 795 (1968). Thus, the Court has upheld a New York statute prohibiting the sale of obscene material to minors under 17, where the statute defined obscenity as meaning the quality of any description or representation of nudity, sexual conduct, etc., when it

"(i) predominantly appeals to the prurient, shameful or morbid interest of minors, and (ii) is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors, and (iii) is utterly without redeeming social importance for minors." *Ginsberg,* supra, at 646, 88 S.Ct. at 1284.

The Court emphasized that, in order to sustain the statute, it need conclude only that it was not irrational for the legislature to find that exposure to the condemned material is harmful to minors. It is significant, however, that the definition of "obscene material" employed in the statute did not extend the scope of "obscenity" beyond the Supreme Court's historically-sanctioned three-pronged definition. The Court did not consider

the question of the obscenity of the material involved, but it intimated that it would more broadly construe the traditional definition of obscenity when applied to cases involving sales to minors. But the Court never suggested that material which has no relationship to a minor's "prurient interest" can qualify as "obscene material."

Mr. Cotton alleges that his initial response to SPACE CITY! was provoked by a "letter to the editor" which appeared on the second page and which bore the caption "High Skool [15] is Fucked." [16] Referring to this "letter," Mr. Cotton testified that he

"realized then it should not be on the Waltrip campus, that if it were to come onto the Waltrip campus, it would create problems for us, create problems in the classrooms, create problems all over the school because it was the type of writing that is not acceptable in our community or in our schools."

In response to an inquiry about the specific manner in which the particular issue of SPACE CITY! violated School Board policy, Mr. Cotton replied,

"because it had obscene words in it and these words are obscene in our area and on the school campus at Waltrip High School."

The court is persuaded that, on the basis of the Board's wording of its regulation, which specified "obscene language" rather than "obscene material," Mr. Cotton concluded in good faith that a written statement that "High Skool is Fucked" fell within the purview of the regulation. It is therefore evident that the possibility for abuse attending such a prohibition of "obscene language" is so great that such a wording of the regulation cannot pass the constitutional test. But even if "obscene language" had been comprehended within the court's injunction, Mr. Cotton nevertheless failed to apply to his judgment that

15. The substitution of "k" for "c" and "ch" (e. g., "Amerika") is widely current among publications of the New Left, and is believed to derive from the writings of Franz Kafka.

16. The letter, captioned "High Skool is Fucked," reads as follows:
Dear Brothers and Sisters,
What ever happened to the skools where you learned? Now you compete for grades, memorize and spit it back out on test day. It is as boring as hell, you don't talk to your friends in class or you get your ass bit. You grow your hair long because you love it and its beautiful, then you get thrown out for being a radical and not wanting to conform to the fucked rules and regulations of the so-called "great society." Big shit! Think about your brothers the chicanos and blacks getting fucked all the time, only because they weren't born white. You write up a leaflet, pamphlet or newspaper to get your friends to get it together, and see how they are getting fucked, and you get thrown out.
The courses skools have are the same ones they have had for fifty years. They don't try to teach, they just want you to pass and get the fuck out of there. It's their jobs—they are getting paid not us. You try to get the attention of the administration and skool board by boycotts or demonstrations and you get thrown out or busted.
Like some might be trying to learn but you can't because you're busy getting hassled for the length of your hair. Big shit! Hair length or the clothes you wear don't have a fucking thing to do with learning. If you could be in a relaxed atmosphere you might could learn something. But not at skool, they're too busy telling you to "sit up straight," "don't chew gum," "you can't smoke in skool," "don't come back til you cut your hair and wear decent clothes," "don't talk or we'll bust your ass." Man it is a big fucking burn you just can't learn under those conditions.
You have read and heard the same thing before, but we have to quit fucking around and do something. Right now! I don't mean petitions and talks with the administration because they have been tried and failed. Now is the time to go to actions and not talking. Do it!
Venceremos!
Gerald (Bushman) Smith
MacArthur High
Houston
P.S. Space City is the most out-a-sight paper keep putting it out. We just love you. MacArthur Sr. High is fucked.

SPACE CITY! is obscene two important limitations on the obscenity test.

In the first place, Mr. Cotton did not consider the issue of SPACE CITY! as a whole. He testified that he had not read the issue to any appreciable degree, and had not even scanned it beyond the second page. As long ago as 1934, a federal court held that a publication must be considered as a whole in order to determine whether it is obscene. Affirming a district court decision not to interfere with the importation of James Joyce's *Ulysses* into the United States, Judge Augustus Hand found that

> "the book as a whole is not pornographic, and, while in not a few spots it is coarse, blasphemous, and obscene, it does not, in our opinion, tend to promote lust * * * The question in each case is whether a publication taken as a whole has a libidinous effect." United States v. One Book Entitled "Ulysses" by James Joyce, 72 F.2d 705, 707 (C.A.2, 1934).

The Supreme Court adopted this test in its first major attempt to deal with the complex issue of obscenity, Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957).

A federal court in New Orleans recently rejected the argument that an allegedly obscene newspaper need not be judged as a whole, because it is merely a package of separate publications. The court cited the Supreme Court's decision in Ginzburg v. United States, 383 U.S. 463, 86 S.Ct. 942, 16 L.Ed.2d 31 (1966), to the effect that the obscenity of a magazine composed of several articles and illustrations depends on the effect produced by the publication as a whole, even though some of the items are obscene and some are not:

> "A publication is not obscene merely because it constains a blunt, Anglo Saxon word. The Old Testament contains passages of sexual candor, and four-letter words are not used for the first time in the literature of the seventies." United States v. Head, (E.D. La.) 317 F.Supp. 1138, at 1143 (Sept. 1, 1970).

The court finds therefore that respondent Cotton erred in not considering the issue of SPACE CITY! as a whole before making a determination of its obscenity.[17]

Respondent Cotton also failed to apply correctly another part of the obscenity test, the definition of "common community standard" by which a work must be judged to determine its obscenity. Mr. Cotton stated clearly that he had evaluated the newspaper in terms of its probable reception in the area of Waltrip High School, and had concluded that its dissemination was "unacceptable" in that area.

The court's injunction was meant to apply to the entire Houston Independent School District. Separate standards for individual schools were not contemplated, nor can they be tolerated. The "community" whose "common standards" are at issue must necessarily be the whole community of the Houston Independent School District. The court finds, therefore, that respondent Cotton erred in disallowing distribution of SPACE CITY! on the basis of its unacceptability in the "Waltrip community."[18]

---

17. Mr. Cotton in fact correctly applies the test to publications which he believes possess "educational merit." With regard to numerous periodicals and books displayed in the Waltrip and other libraries of the Houston Independent School District, and containing numerous examples of vulgar language, Mr. Cotton states repeatedly that, although the words themselves are "obscene," their usage in such publications does not render obscene the total work because such publications have "educational merit" and are "approved by the powers that be."

18. Judge Singleton of this District has expressed doubt, with which this court is in full agreement, that *any* community standards should be allowed to shackle individual freedom:
"Certainly, the democratization of American life has not come to the point where every whim of the majority may be enacted into a mandate for all to follow. If so, then the Bill of Rights is for naught." Calbillo v. San Jacinto Junior

■ In sum, it is apparent that, even if the presence of "obscene language" in a publication qualified as an acceptable criterion for determining a student's right to distribute it, respondent Cotton failed to consider the constitutional limitations on the test for obscenity. But the court is also convinced that the particular "letter to the editor" which formed the basis of Mr. Cotton's decision to suspend movant is not in itself obscene, and further, that intermittent employment of "fuck" and its ilk cannot, without more, render a publication obscene.

Dr. Stephen Tyler, professor of linguistics at Rice University, testified that the use of "fuck" in the declaration, "High Skool is Fucked," has no reference to sex and, in fact, denotes that high school is "in bad shape * * * in a pretty lousy state of affairs." Thus, the first requirement of the obscenity test, a prurient interest in sex, has not been satisfied.

Dr. Tyler asserted further that most students do not ascribe an obscene status to the word "fuck" as employed in the article in question. The word, he said, is simply becoming desemanticized, and this effect is especially evident among youth. A 15-year old female student, Cathy Christoph, confirmed this view when questioned about the possible difference between the acceptability of such language by adults and its acceptability by students:

"To young people it's more or less accepted, I mean, it's an every-day happening. And ordinary people, they just aren't used to it and they were raised up to believe that it was wrong."

College, 305 F.Supp. 857, 861 (fn. 4) (S.D.Tex., 1969).
But the "common community standard" test apparently still commands the approval of a majority of the Supreme Court.

19. The following books and periodicals, all of which contain words which Mr. Cotton describes as "obscene language," appear, or have appeared, in the following school libraries, among others, of the Houston Independent School District: *Atlantic Monthly* (Wheatley, Lamar, Bellaire,

The Supreme Court, on June 7, 1971, finally laid to rest the argument that the indiscriminate use of "fuck" is necessarily tantamount to obscenity. Cohen v. California, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971). The Court, in a 5–4 decision whose opinion was delivered by Mr. Justice Harlan, reversed the breach of the peace conviction of an individual who had worn a jacket bearing the words "Fuck the Draft" into a corridor of the Los Angeles Courthouse. The Court quickly dismissed the obscenity argument:

"This is not, for example, an obscenity case. Whatever else may be necessary to give rise to the States' broader power to prohibit obscene expression, such expression must be, in some significant way, erotic. * * * It cannot plausibly be maintained that this vulgar allusion to the Selective Service System would conjure up such psychic stimulation in anyone likely to be confronted with Cohen's crudely defaced jacket." *Id.* at 20, 91 S.Ct. at 1785.

Furthermore, respondents have forfeited their right to object to the appearance of "fuck" in SPACE CITY! by sanctioning the presence, in libraries of the Houston Independent School District, of various books and periodicals that contain similar vulgarisms.[19] A federal court in Michigan has previously examined the absurdity of such a double standard:

"David Vought has been expelled from school for having possession of the Argus publication, on the ground that it contains certain four-letter words. The same four-letter words appear in

Westbury, Kashmere, Waltrip); *Harper's Magazine* (Wheatley, Lamar, Bellaire, Westbury, Kashmere, Waltrip); *A Separate Peace*, by John Knowles (Wheatley, Lamar, Bellaire, Westbury, Kashmere, Waltrip); *The Catcher in the Rye*, by J. D. Salinger (Wheatley, Bellaire, Kashmere); *The Confessions of Nat Turner*, by William Styron (Bellaire, Westbury, Kashmere); *Love Story*, by Erich Segal (Bellaire, Kashmere); *Nigger*, by Dick Gregory (Wheatley, Kashmere).

'The Catcher in the Rye' and the Harper's Magazine. Plaintiff's expulsion is not based on the general content of the Argus, or its literary quality or lack of literary quality, or its philosophic bent, or the type of publication it is, but is based solely on its containing certain four-letter words (or variations thereof)—the same words as appear in 'The Catcher in the Rye.' If we, as a trial court, are confused, what are we to suppose is the state of mind of a student subjected to such a double standard? If the Argus is obscene within the meaning of the school principal's 'directive,' then surely 'The Catcher in the Rye' and the Harper's article must also be obscene. And if the student is invited and/or required to read the latter two, what can the school authorities have in mind in expelling him for possession of the former? We are compelled to reject the position of the defendants in this case because it is preposterous on its face. It is contrary to any sense of fairness or consistency—a student, placed in the situation in which this school has placed this student, is required to make a judgment that we, as a court, would find difficult to make. * * *

"We decline to become involved here in a discussion on obscenity—that area of the law today is about as well-defined as the course of a tornado. We profess no expertise whatsoever in this field, but we do recognize rank inconsistency when we see it. And we see it here. And the inconsistency is so inherently unfair as to be arbitrary and unreasonable, constituting denial of due process, thus compelling us to conclude that the plaintiff's expulsion may not stand." Vought v. Van Buren Public Schools, 306 F.Supp. 1388, 1395–1396 (E.D.Mich., 1969).

Mr. Cotton's only attempted justification for this double standard is the purported "educational merit" of the approved works. Mr. Cotton explained that the concept referred to

"whether or not books or periodicals would be approved by a group of people who would know what they were talking about so far as contents, description of characters. I am speaking in terms of English teachers, supervisors who know books and know them well, and know what is best for the students in the Houston Independent School District."

Dr. Tyler, on the other hand, would apparently find that SPACE CITY! possesses sufficient "educational merit";

At the risk of offending the Houston press, I would say that this is a better piece of journalism than, say, the 'Houston Chronicle,' which happens to be the paper I read at home * * * It has a wider variety of stories and in-depth coverage than you find in the usual metropolitan daily newspaper. It also goes into topics that are, if not taboo in the daily newspaper, relegated to something in the rear pages of the newspaper."

Although Mr. Cotton would probably accept on his campus any publication approved by "the powers that be," he suggests certain criteria that might render a book acceptable even though it contains a generous sample of "obscene language." Such language, when employed by *Harper's, Atlantic Monthly*, and a number of books that appear in libraries of the Houston Independent School District, should be tolerated because it describes "things as they were at the time":

"You will find quite a bit of this in a number of books where you have books about the war, about the poor people, the underprivileged. Many times this is the way they speak and this, to them, is not obscene. It's just a matter of their own conversation."

Mr. Cotton seems therefore to approve the use of vulgar language when it is employed to depict the speech of a bygone era, but not when employed by a contemporary young person to describe his current dissatisfaction with the educational system. The court is unable to comprehend such a distinction and con-

sequently, is constrained to find that respondents have failed to demonstrate a basis for discrimination between the use of vulgarity in SPACE CITY! and its use in school-approved publications. The court finds that, based on the standard of obscenity employed by the Houston Independent School District, neither the letter, "High Skool is Fucked," nor the entire issue of SPACE CITY! in which it appears, is obscene.

The court has of late observed a trend toward increasingly greater toleration of words that were once scrupulously avoided. Judge Wyzanski recently directed the school district of Lawrence, Massachusetts, to reinstate a teacher who had been dismissed because he wrote the word "fuck" on the blackboard to illustrate a class discussion of taboo words. Mailloux v. Kiley, 323 F.Supp. 1387 (D.Mass., 1971). The court found that

> "Boys and girls in the eleventh grade have a sophistication sufficient to treat the word from a serious educational viewpoint. While at first they may be surprised and self-conscious to have the word discussed, they are not likley to be embarrassed or offended." *Id.*, at 1389.

Even more recently, the Supreme Court declared, in Cohen v. California, supra, that

> "The ability of government, consonant with the Constitution, to shut off discourse solely to protect others from hearing it is, in other words, dependent upon a showing that substantial privacy interests are being invaded in an essentially intolerable manner. Any broader view of this authority would effectively empower a majority to silence dissidents simply as a matter of personal predilections." *Id.*, 403 U.S. at 21, 91 S.Ct. at 1786, 29 L.Ed.2d 284.

Those who objected to the message of Cohen's jacket were not a captive audience. They

> "could effectively avoid further bombardment of their sensibilities simply by averting their eyes. * * *. Surely the State has no right to cleanse

public debate to the point where it is grammatically palatable to the most squeamish among us." *Id.*, at 21–25, 9 S.Ct. at 1786–1788.

In a society in which the old and the traditional is daily being challenged by the new and the unprecedented, those who seek to guard against the encroachment of taboo words appear to be waging defensive warfare. The court believes that, far from signalling the moral crisis of our civilization, such a development is a healthy indicator of moral progress. In a witchhunt to expunge the momentarily embarrassing, we frequently tolerate language and name-calling that degrades the human spirit, and leaves its heritage of bitterness long after we have forgotten the reddened face and the temporary loss of composure that flash our instantaneous reaction to a string of four-letter words.

> "For Christians the truly obscene ought not to be slick-paper nudity, nor the vulgarities of dirty old or young literati * * * What is obscene is that material, whether sexual or not, that has as its basic motivation and purpose the degradation, debasement and dehumanizing of persons. The dirtiest word in the English language is not 'fuck' or 'shit' in the mouth of a tragic shaman, but the word 'NIGGER' from the sneering lips of a Bull Connor." statement of Howard Moody, January 25, 1965, quoted in *Christianity and Crisis*, March 22, 1971, at 45.

### 5.

### Content of the Newspaper

 The School Board regulation, in conformity with the injunction's mandate that a student-distributed publication may not be prohibited, except for obscenity and libel, on account of its content, dutifully recites that

> "Distribution shall not be prohibited because the publication contains the expression of any idea, popular or unpopular."

The court has reluctantly concluded, however, that Mr. Cotton determined to prevent distribution of a particular issue of SPACE CITY! because he disapproved its social philosophy, its political position, and its unorthodox style.

In his testimony, Mr. Cotton, although he generally took care to fashion his objections to the publication in terms of obscenity, occasionally revealed the more probable basis for his decision to prevent distribution. Responding to an inquiry about the possible distinction between the use of the word "fuck" in SPACE CITY! and its use in school-approved publications, Mr. Cotton replied,

> "Now, I am not saying that these words are not, would not be used in some of the English books. I will cover that later. I am saying that in this particular article where you have a conglomeration of words, nothing but spite and disrespect for the school."

Movant's counsel immediately seized upon this revelation about "spite and disrespect" and attempted to provoke Mr. Cotton into amplifying. But the principal quickly returned to his standard characterization of the article as obscene.

Later in his testimony, Mr. Cotton discussed his reaction upon being informed that a student was selling SPACE CITY! at the entrance to Waltrip:

> "And I went immediately to the entrance because I was familiar with the SPACE CITY! newspaper and I did not want the SPACE CITY! news on the campus."

The court then asked Mr. Cotton if, prior to his confrontation with movant, he had formed an opinion about SPACE CITY!:

> "Yes, sir. This is correct. Not this particular issue, but I knew what had been in some of the other papers, obscene language, and it had no merit as far as the contents were concerned."

When such admissions are considered in conjunction with the presence in the Waltrip library of periodicals containing the same "obscene language" that Mr. Cotton found unacceptable in SPACE CITY!, the conclusion is inescapable that Mr. Cotton proscribed SPACE CITY! primarily because, on the basis of previous issues and on the basis of the letter "High Skool is Fucked," he believed that it evidenced a brazenly insulting attitude toward values cherished by Mr. Cotton and the vast majority of Americans.[20] Preeminent among these is the authority which school officials possess over the lives of students. In Mr. Cotton's view, distribution of SPACE CITY! at Waltrip would undermine his authority to a completely intolerable degree. But it was not lust for personal power that motivated his response. The public school is, to Mr. Cotton, and to countless millions of his fellow citizens, one of the bulwarks of this nation. To attack the public school is to sabotage America.

The court does not quarrel with these beliefs, and, in fact, shares the concern of respondents and others about the breakdown of discipline in the public schools. Free expression, nevertheless, cannot prevail unless courts are vigilant to impose limitations on institutions that, whether knowingly or unwittingly, seek to stifle free expression. A previous injunction has defined these limitations. In the case at bar, the court affirms their validity.

### 6.

### Disruption

■ Much attention has been devoted in recent years to "disruption" as a criterion for determining the limits of the legitimate exercise of student rights. The court's injunction permitted regulation of student distribution to the limited extent necessary

---

20. Proscription of particular words seemed to the Supreme Court, in Cohen v. California, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971), to involve "a substantial risk of suppressing ideas in the process. Indeed, governments might soon seize upon the censorship of particular words as a convenient guise for banning the expression of unpopular views." Id., at 26, 91 S.Ct. at 1788.

"to prevent substantial and material interference with or delay of normal classroom activity or normal school function."

The Board's regulation ignores this difficult problem. Apparently, the Board assumed that any distribution not conforming to imposed restrictions should be deemed "disruptive." But in presenting their evidence to the court, respondents attempted to demonstrate that movant's distribution of SPACE CITY! had indeed resulted in significant disruption.

The only evidence of disruption offered by respondents is the testimony of Mrs. Carrie Tomlinson, a geometry teacher at Waltrip. Mrs. Tomlinson stated that one of her students brought into her class a copy of SPACE CITY!, apparently purchased from movant, and began reading it in full view of teacher and fellow students. Mrs. Tomlinson testified that she considered the episode disruptive; indeed, she confiscated the newspaper from the offending student. But Mrs. Tomlinson also left the clear impression that the particular contents of this issue of SPACE CITY! was not the culprit.

At the hearing before the School Board, she agreed that the student was "making a spectacle of himself" in reading the newspaper, and later, that the "disruption" resulted primarily from

"the manner in which he was displaying the paper and the fact that he was reading it when we were supposed to be spending our time working * *."

And to Reverend Everett's query as to whether the reading of *any* newspaper in class would be disruptive, Mrs. Tomlinson replied that

"it would be if it distracted the attention of the other students."

This brief incident, quickly resolved by an experienced teacher, represents the sole evidence of disruption traceable to movant's distribution of SPACE CITY!. Mrs. Tomlinson was able immediately to put an end to the "disturbance," without significant effort or loss of time, merely by correcting the offending student.

In short, the disruption resulting from such distribution was negligible. Respondents have completely failed to demonstrate that "substantial and material interference with normal classroom or school activity" that is contemplated by the court's injunction.

■ In anticipation, however, of some future disruption, the court feels obliged to clarify the extent to which "disruption" should result in the discipline of a student distributor. In the opinion accompanying its previous injunction, this court declared that

"It is also clear that if a student complies with reasonable rules as to times and places for distribution within the school, and does so in an orderly, nondisruptive manner, then he should not suffer if other students who are lacking in self-control tend to over-react, thereby becoming a disruptive influence." *Sullivan*, supra, 307 F.Supp. at 1340.

Such sentiments did not originate with this court. The Supreme Court made it clear in *Tinker* that it did not view with favor the discipline of students who do not themselves provoke disturbance:

"The school officials banned and sought to punish petitioners for a silent, passive expression of opinion, unaccompanied by any disorder or disturbance *on the part of petitioners.* There is here no evidence whatever of petitioners' interference, actual or nascent, with the schools' work or of collision with the rights of other students to be secure and to be let alone. Accordingly, this case does not concern speech or action that intrudes upon the work of the schools or the rights of other students." *Tinker*, supra, 393 U.S. at 508, 89 S.Ct. at 737.

In Cohen v. California, supra, the Court again rejected the view that the protesting individual must be silenced in order to protect society from possible outbursts by violence-prone opponents:

"We have been shown no evidence that substantial numbers of citizens are standing ready to strike out physically

at whoever may assault their sensibilities with execrations like that uttered by Cohen. There may be some persons about with such lawless and violent proclivities, but that is an insufficient base upon which to erect, consistently with constitutional values, a governmental power to force persons who wish to ventilate their dissident views into avoiding particular forms of expression. The argument amounts to little more than the self-defeating proposition that to avoid physical censorship of one who has not sought to provoke such a response by a hypothetical coterie of the violent and lawless, the States may more appropriately effectuate that censorship themselves." *Id.*, 403 U.S. at 23, 91 S.Ct. at 1787.

The Court of Appeals for the Seventh Circuit has delineated a constitutionally tolerable method for dealing with disorder:

" * * * the Supreme Court has indicated that the principles announced in *Terminiello* are not without application when the free speech of students is threatened. * * * We think a similar principle operates to protect long-haired students unless school officials have actively tried and failed to silence those persons actually engaged in disruptive conduct * * * The record is silent, however, concerning actions taken by the school officials to punish those students who actually caused the relatively insubstantial disruption which occurred in this case. Therefore, we hold that defendants have failed to satisfy their substantial burden of justification under their first theory." Crews v. Cloncs, 432 F.2d 1259, 1265–1266 (C.A.7, 1970).

In the event that school officials have tried and failed to control the disruptive students, they may justify "emergency action" against the long-haired student only upon a showing of "exceptional circumstances." *Crews*, supra, at 1266, fn. 8.

This court adheres to such a view. In order to sustain suspension of a student distributor, respondents must demonstrate (1) substantial and material interference, and (2) a good faith, but unsuccessful attempt to discipline the disrupting student or students. Furthermore, respondents should not be permitted to enact blanket prohibitions merely upon an "undifferentiated fear or apprehension of disturbance." *Tinker*, supra, 393 U.S. at 508, 89 S.Ct. at 737. The Supreme Court has expressed this thought most eloquently:

"Any departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear. Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk * * *" *Tinker*, supra, at 508, 89 S.Ct. at 737.

7.

The Special Emergency Situation

■ The court recognizes that exceptions necessarily delimit every rule. In the emotionally charged area of public school policy, a greater-than-usual degree of flexibility is perhaps essential. The testimony of respondents' witness Mr. Lawrence Marshall, area superintendent for zone six of the Houston Independent School District, confirms what is obvious to courts and educators alike: that, in time of crisis, where lives and property are seriously threatened, customary constitutional protections may be temporarily curtailed in order to prevent the destruction of the system which confers those rights. At the same time, the striking contrast between the emergency situation depicted by Mr. Marshall, and the almost routine incident of the case at bar, provides further evidence that the first amendment is the rule, whose abrogation the state must subsequently demonstrate was clearly justified by the peril of the moment.

Mr. Marshall related an incident that occurred earlier in the school year at Sam Houston High School. An explosive situation had developed out of the hostility between black and white students, inflamed by what Mr. Marshall believes are "outside forces * * * bent upon disrupting the community and the educational process," in order to prevent the successful implementation of the court-ordered desegregation of the school. Fights were continually breaking out and then, a stabbing took place. Mr. Marshall decided to send home a large number of students in order to allow time for passions to cool. Although such action may be classified as a technical breach of this court's previous injunction, the court is convinced that the situation described had clearly reached a stage at which emergency measures were justified under the "clear and present danger" theory. Furthermore, the subsequent conduct of Mr. Marshall was so exemplary that the court commends him for the high degree of concern for students which his actions demonstrate.

In the first place, all suspended students were permitted to return to campus the following week, with or without their parents. Following the students' return, Mr. Marshall separately convened each of the three classes to attempt to reach a solution. Finally, Mr. Marshall testified that, in his view, suspension should be utilized only as a last resort. The school, he believes, is obligated first to make every effort to rehabilitate a student's behavior.

Mr. Marshall acted calmly and intelligently to choke off an extremely dangerous buildup of student passion. He chose the only reasonable course open to him at the moment, and the court has no doubt that, throughout the ordeal, his primary concern was the safety of his students. It is ludicrous to attempt comparison between the crises at Sam Houston and the effects of movant's distribution of SPACE CITY! at Waltrip. To recognize the first amendment rights of students is not to tie the hands of administrators in truly perilous situations. Judicious men will be readily able to draw the distinction. And courts will remain available to assist the less discriminating.

IV

How Paul Kitchen Was Suspended

1.

The Power to Suspend

Another major focus of movant's attack relates to the procedures employed by respondents to effect his suspension. The court's injunction set forth the minimum requirements with which respondents must comply in order to guarantee a student his right to due process under the fourteenth amendment to the United States Constitution. For suspensions of more than three days, and for all suspensions not specifically limited to three days or less at the time of imposition, the injunction required (1) written or personal notice, both to the student and to at least one of his parents; (2) an offer of a formal hearing at which evidence might be presented by both sides; and (3) a decision based on a "dispassionate and fair consideration of substantial evidence that the covered student committed the acts for which discipline is imposed and that such acts are in fact a proper reason for such discipline."

The School Board incorporated all these provisions, and several others,[21] within its new regulations. The original "hearing," however, is to be conducted by the principal. For reasons that are fully explained below, the court considers this aspect of respondents' procedures to be inconsistent with due process and with the court's injunction. Furthermore, the regulations were themselves violated in the particular case at bar. First, however, the court will briefly consider the school's power to suspend.

It is probably a futile undertaking to attempt to measure the value of the high school diploma in American society in

21. See footnote 4, supra.

A.D.1971, a society of paper credentials. In most cases, it is a sine qua non of economic prosperity, if not economic survival. It confers social benefits that endure for a lifetime, and it undoubtedly contributes significantly to the psychic health of an individual. Education, in short, is a priceless commodity.

Furthermore, it is a fundamental right of every citizen. Just as the Supreme Court has declared that United States citizenship cannot be revoked except by voluntary expatriation, Trop v. Dulles, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958), so courts should declare that an individual's guarantee of an education, only quantitatively less basic than the right of citizenship, cannot be annulled, even temporarily, except in the most extreme circumstances.

In addition, suspension is a particularly humiliating punishment, evoking images of the public penitent of medieval Christendom and colonial Massachusetts, the outlaw of the American West, and the ostracized citizen of classical Athens. Suspension is an officially-sanctioned judgment that a student be for some period removed beyond the pale. Should he venture onto the campus while under suspension, school officials threatened him with police intervention.

"* * * it must not be forgotten, however small the community, however familiar to one another the characters in the drama, that when a school board undertakes to expel a public school student, it is undertaking to apply the terrible organized force of the state, just as surely as it is applied by the police, the courts, the prison warden, or the militia." Breen v. Kahl, 296 F. Supp. 702, 707 (W.D.Wisc., 1969), aff'd 419 F.2d 1034 (7th Cir. 1969).

The outcast student may learn a lesson from his suspension, and return to school a remorseful and more docile individual. On the other hand, the student may choose not to return at all. Without encouragement from school or family to continue his education, he may view himself as a failure, and his fate as deserved.

Dr. William Glasser has written, in *Schools Without Failure*, (New York: Harper & Row, 1969) that a large portion of our educational system is failure-oriented:[22]

"* * * there are factors within the education system itself that not only cause many school problems but that accentuate the problems a child may bring to school." Glasser, supra, at 8. Just as the major responsibility for such failures rests with the school as an agent of the larger society, so it is upon society that the results of such a short-sighted policy will be visited:

"Unless we can provide schools where children, through a reasonable use of their capacities, can succeed, we will do little to solve the major problems of our country." Glasser, supra, at 6.

The suspended student is frequently the child of parents who attach little importance to education, or who are simply unconcerned about their child's welfare. In such instances, the emphasis of the School Board's regulations on the parental role in effecting the return of a suspended student, and most particularly, the failure of those regulations to require the school to take the initiative in insuring his return, constitute a reckless abdication of responsibility.[23] Such omis-

22. It seems to this writer that a child who fails often first seeks attention and frequently, this effect is manifested in some dramatic or unusual conduct. In this case, it appears that the real reason movant decided to confront the enormous power vested in the high school principal was his failure to make the school basketball team.
Movant also appeared to be an underachiever in his academic work. His spring, 1970, grade averages were C, D, D, F, F. His spring, 1971, grades, however, showed a marked improvement: C, B, B, B. Furthermore, it is interesting to note that movant's conduct grade has been, with one exception, "E" (excellent) throughout high school.

23. It might be that the American public school system wants only the all-American child—the child who is not emotional-

sions permit the principal to attach onerous conditions to the student's re-entry. In the case at bar, respondent Cotton refused to allow movant to return to school until one of his parents attended a meeting with the principal.

Even if the parents of the suspended student are dedicated to his best interests, it often happens that, because of conflicting obligations, the parents are unable to meet with the principal for a substantial length of time, during which the student remains suspended. Such is the situation in the case at bar.

Movant was suspended on Tuesday, October 20. His father, Anthony P. Kitchen, was unable, however, to attend the required meeting with Mr. Cotton until the following Monday. Mr. Kitchen's supervisor, Mr. Harold Kelly, chief test board man for Southwestern Bell, testified that, during the entire week of October 19, Mr. Kitchen was engaged in a very unusual activity, which consisted of relocating microwave terminals while keeping all toll facilities in operation. Mr. Kitchen was the only employee under Mr. Kelly's supervision who was qualified to perform this task, and leave had been scheduled well in advance. Because Mr. Cotton declined to meet with Mr. Kitchen during other than school hours, movant was obliged to remain in limbo

for six days. The meeting was scheduled for Monday, October 26, but never took place, because Mr. Cotton had by then requested the police to remove movant from campus, and Mr. Kitchen thereupon decided to consult an attorney.

Courts cannot compel parents to concern themselves with their child's education to the exclusion of every competing obligation. The possibilities for conflict are numerous: Illness, death, employment, other children. And it would be futile for courts to attempt to educate unconcerned parents about their responsibilities toward their children. The only plausible course is to persuade the school to abandon the view that suspension represents the termination of the school's responsibility. Rather than enabling school officials to rid themselves of undesirables and undesireds, suspension should be considered as merely a preliminary phase of a long and difficult struggle to salvage the rejected student—and not merely to reclaim his physical presence, but to invigorate his intellectual curiosity and above all, to replenish his self-esteem.[24]

Mr. Marshall expressed in his testimony the view that the burden ought to be on the school to follow up on a suspended student, to attempt to ascertain whether the source of the disciplinary problem

---

ly disturbed nor troubled by behavior problems; one who comes to school neat, clean and well-dressed and with all the extra (and sometimes expensive, to him) paraphernalia; one who is passive and non-aggressive and will sit all day with his hands folded neatly in front of him.
It might be that this type of school system is partly responsible for the increase in crime and delinquency. A school system that causes a large number of students to fail in their academic work, in their style of life, in athletics and in social acceptance, will cause these failures to be pushed into the streets with other failures, from whence it is often only a short step to a juvenile court.
The distinguished judge of the Harris County Juvenile Court, Judge Wallace H. Miller, recently expressed the opinion that school authorities contribute to juvenile delinquency by "summarily kicking a kid out" of school when a criminal

charge is lodged against him. Speaking before a panel named by the Houston School Board to define the school district's role in dealing with juvenile delinquency, vandalism and crime, Judge Miller said that, although it is understandable for school officials to dismiss students who have broken school policies, he "can almost guarantee we'll have a delinquency case when we might not have had one." *Houston Chronicle*, March 23, 1971, at 9.

24. One solution might be to send a suspended student to a central location under the supervision of the school district until his parent or guardian is notified, rather than turning the child out on the street without a follow-up. But this kind of approach, as well as punishment by retention after school or extra assignments, may not be popular with teachers and administrators because it requires of them a larger expenditure of time and effort.

might be discovered in the home. Mr. Marshall believes that a suspended student remains the responsibility of the school. The court wholeheartedly agrees.

Mr. Marshall further testified that, in his opinion, suspension should be employed only as a last resort. It is the role of the principal, he feels, to endeavor to rehabilitate the behavior of recalcitrants. Mr. Marshall is presently attempting to mobilize all available school personnel in his area for this task of rehabilitation.

> "We are moving toward an open school concept, not only in terms of classrooms, but in terms of the community where you can have community involvement. We now have counselors working around the clock to strive to establish contact with parents in order to help these youngsters."

Although Mr. Marshall feels very strongly that suspension ought to be maintained for dealing with extreme situations, both his rhetoric and his performance indicate that a decision to suspend is for him no casual determination. The three-day suspension remains intact, and should provide a challenged principal with sufficient leverage to discipline the incorrigible when all other means fail. And in times of emergency, the principal may of course temporarily subordinate student rights to student safety.

### 2.

### Who Can Suspend

The court's injunction requires school officials to predicate any decision to suspend a student "upon a dispassionate and fair consideration of substantial evidence." The School Board's revised regulations continue, however, the policy of permitting the principal to conduct the original hearing and to render the initial ruling, even in cases where the basis of the suspension is a confrontation between the principal and the ousted student.

The regulations describe an appellate process through an assistant superintendent, a deputy superintendent, the Superintendent for Instruction and Administration, and ultimately, to the Board of Trustees. But the tendency of virtually every administrative appellate body to affirm the decisions rendered at a lower level means that it is particularly vital that the initial hearing offered a suspended student be a meaningful one. The court is persuaded that it is unrealistic to expect that such a hearing can be meaningful when prosecutor and judge are united in the same individual.

The Court of Appeals for the Fifth Circuit, in Williams v. Dade County School Board, 441 F.2d 299 (1971), recently held that a meeting between a principal, a suspended student, and the student's parents, in which the principal merely explained to the parents the decision he had already reached, did not qualify as a "hearing," even though denominated as such by the principal.[25] The court did not deal with the question of whether the principal should be permitted to conduct a hearing for the student whom the principal has himself decided *to* suspend. This *court* believes, however, that it is practically inevitable that a principal, who as prosecutor has adjudged a student in need of suspension, will, as judge, affirm his own prior ruling.

Recently, the Supreme Court has offered some support for this view. In Mayberry v. Pennsylvania, 400 U.S. 455, 91 S.Ct. 499, 27 L.Ed.2d 532 (1971), the Court held that a criminal defendant who

---

25. In Banks v. Board of Public Instruction of Dade County, 314 F.Supp. 285 (S.D.Fla., 1970), a three-judge court in this Circuit upheld a suspension imposed, without a hearing, for a ten day period. The court in *Williams* distinguished between the 30 days imposed therein, and the ten days imposed in *Banks,* and held that a hearing was required in the former case. The three-judge court did not, however, establish a rule of ten days as the definitive line of demarcation in determining what is "substantial discipline." This court's injunction established that line at three days, and the court remains convinced that three days is the most appropriate figure.

repeatedly insulted and vilified the trial judge while disrupting courtroom proceedings was entitled, under the due process clause, to a public trial before another judge on contempt charges. The Court recognized the inherent difficulty facing the judge whose judicial impartiality is compelled by due process, but whose personal animosity is dictated by human nature:

> "Yet a judge, vilified as was this Pennsylvania judge, necessarily becomes embroiled in a running, bitter controversy. No one so cruelly slandered is likely to maintain that calm detachment necessary for fair adjudication. In re Murchison, 349 U.S. 133 [75 S.Ct. 623, 99 L.Ed. 942] * * was a case where a judge acted under state law as a one-man grand jury and later tried witnesses for contempt who refused to answer questions propounded by the 'judge grand jury.' We held

that since the judge who sat as a one-man grand jury was part of the accusatory process he 'cannot be, in the very nature of things, wholly disinterested in the conviction or acquittal of those accused.' *Id.*, at 137 [75 S.Ct. at 626] 'Fair trials are too important a part of our free society to let prosecuting judges be trial judges of the charges they prefer.' " *Id.* Mayberry, supra, 400 U.S. at 465, 91 S.Ct. at 505, 27 L.Ed.2d at 540.

This court will not prescribe for respondents any particular procedure to enable them to provide the kind of "meaningful" hearing mandated by the previous injunction and by principles of due process. The court merely *proscribes* the procedure whereby any single individual can both determine to suspend a student and subsequently, function as the court of original jurisdiction to judge the propriety of that suspension.[26]

26. In the New York City schools, the principal may suspend for a period of up to five days. Even for short-term suspensions, detailed regulations apply to safeguard the constitutional rights of the disciplined student. In the Houston Independent School District, by contrast, short-term suspensions, defined by this court as suspensions for a period of three days or less, are totally committed to the discretion of the principal and subject to no written regulations whatsoever.

In the Philadelphia schools, the following rules apply to suspensions in excess of five days:

"1. A member of the Board, sitting as a committee of one, together, with appropriated staff, shall hear all cases involving suspensions in excess of five school days and expulsions from the school system. This member shall conduct an informal hearing and make a recommendation to the Board.

2. The hearing shall be held promptly.

3. Proper notice of the hearing shall be served on the parent or guardian of the student at least five days before the date of the hearing. In addition to giving the time and place of the hearing, the notice shall briefly set forth the alleged act or acts of which the student is charged.

4. The notice should also advise the student and his parent or guardian of their right to present witnesses and be represented at the hearing by legal counsel. In cases where the student has legal representation, a member of the legal staff of the School District shall represent the school administration.

5. The hearing shall be tape-recorded, from which a summary of the testimony of each witness shall be made on request. Tapes shall be preserved in accordance with practice of the Board.

6. No one except counsel, the parties and their witnesses shall be permitted to be present at the hearing.

7. The witnesses shall give their testimony under oath, and the right of cross examination shall be permitted. The admission of evidence shall be a matter within the discretion of the Board Member.

8. The failure of a student and/or his parent or guardian to attend the hearing, after proper notice, shall constitute a waiver of the right to a hearing.

9. The findings of fact and the recommendation of the Board member to the Board shall be in writing. This recommendation shall be acted upon at the next regular meeting of the Board, and the student and his parent or guardian shall be advised, immediately thereafter, of the Board's decision. The Board shall protect the student's and his parent's or guardian's right to privacy.

10. If the Board expels the student he shall be referred to the school counselor for referral to an appropriate agency for further counseling and guidance, or for assistance in obtaining employment, or continuing his education * * *"

### 3.

### Movant's Suspension

In the case at bar, movant was suspended until Mr. Cotton met with one of his parents. Although respondents have insisted that a hearing could have been held within the hour if movant's parents had been available, the court has already made clear that the rights of a suspended student cannot be made to depend upon the attitude, or the schedule, of his parents.

Mr. Cotton admits that he set no definite limit on movant's original suspension. The suspension must therefore be characterized as one "which is not specifically limited to three days or less at the time of imposition." Accordingly, Mr. Cotton was required by the terms of the court's injunction, before effecting movant's suspension, to provide him with due process as defined in the injunction.

### V

### Available Remedies

Were the court to compel precise conformity to the terms of its injunction, as is vigorously suggested by movant, it would be necessary to hold Mr. Cotton in contempt of court. Even the School Board, by virtue of the failure of its revised regulations to carry out the court's full mandate, must then be adjudged in contempt. The court is convinced, however, that neither the Board nor respondent Cotton has acted in bad faith in interpreting the previous injunction, and that both made a sincere effort to decipher a series of instructions which, at best, omitted vital details, and, at worst, were poorly phrased and even contradictory. That injunction will be clarified in the hope that such confusion will not again arise.

The court will, for the same reason, decline to award movant compensatory damages.[27] Because, however, the justifications announced for the decision to suspend movant, as well as the procedures employed to effect the suspension, are contrary to the previous mandate of this court, movant must be allowed credit for the school work which he missed during the period of his suspension and which he subsequently made up pursuant to the court's temporary restraining order.

At this point, the court must impose a caveat. Students should not be permitted to ignore, as movant did, legally enacted regulations of the school district. Even if such regulations impinge in the most flagrant manner upon the constitutional rights of a student, his remedy is to challenge the rules through lawful means.

The School Board ought to establish a grievance procedure to secure justice for those students who love the law as well as the Constitution.[28] But even if

27. In Pyle v. Blews (No. 70–1829) (S.D. Fla.) (March 29, 1971), a federal district judge in Florida awarded the student plaintiff $100.00 in compensatory damages and $182.00 in court costs.

28. The Philadelphia school system has adopted the following regulations to deal with student grievances:
Section 1—Definitions
A grievance is a complaint by a student in the School District of Philadelphia that there has been to him a personal loss, injury, or a violation, misinterpretation or inequitable application of an established policy governing students.
It is a basic policy of the student grievance procedure to encourage students to discuss their grievance informally with the person against whom the grievance is directed, prior to the grievance procedure. The student may seek advice or services of the ombudsman in attempting to solve the grievance informally. If the student so desires, the ombudsman shall accompany the student in going to the staff member at this informal stage.
It is expected that the great majority of cases will be resolved in this fashion.
Where the technique is proved to be inadequate or the student is unable to do this, he may invoke the grievance procedure.
Section 2—Procedure for Adjustment of Grievances
1. The grievance shall be submitted in writing to the principal. However, if the grievance involves the principal directly or is directed against a policy that the principal has decided upon,

a student is compelled to make his challenge by informal means, this court cannot sanction a student's defiance of every regulation he believes to be a constitutional infraction. Students who subsequently invoke the equitable powers of this court are forewarned that they must come with clean hands. To require less is to invite anarchy.

Movant is granted ten days from the date of this order in which to submit to the court a final judgment securing all relief granted individually to him in accordance with this opinion. In addition, both movant and respondents are granted 30 days from the date of this order in which they may submit to the court a proposed supplementary injunction clarifying the court's previous injunction in accordance with this opinion. Following such submission, each party is granted an additional 15 days in which to submit to the court its objections to the supplementary injunctive relief proposed by the opposing party. The court will then, on the basis of these submissions, issue an injunction supplementing and clarifying its order of December 30, 1969.

the student may decide to skip step 1 and proceed immediately to the District level.

Within 5 school days, the principal shall call a meeting of the student, who may be accompanied by ombudsman or parent, the staff member and the PFT representative, if the staff member so chooses, to discuss the grievance. The principal shall make every effort to resolve the matter equitably and as quickly as possible, but within a period not to exceed 3 days. The principal shall communicate his decision in writing to the student, parent, and the staff member. Failure on the part of the principal either to call a meeting or to render a decision in writing within the designated time, shall constitute the basis for an automatic appeal to the next level.

2. If the grievance is not resolved to the satisfaction of the student, he may appeal the principal's decision to the district superintendent in writing within 3 school days.

The district superintendent or his designee shall meet with the student who may be accompanied by the parent or ombudsman, the staff member and his representative, in order to resolve the matter equitably and as quickly as possible, but within a period not to exceed 5 school days. The district superintendent shall communicate his decision in writing to the student, the parent, the staff member, and the principal.

3. If the grievance is not resolved to the satisfaction of the student, he may appeal the district superintendent's decision to the Superintendent of Schools in writing within 3 school days.

The Superintendent of Schools or his designee shall meet with the student, parent or the ombudsman, the staff member and his representative, within 10 days in attempt to resolve the matter.

The decision of the Superintendent of Schools shall be communicated in writing to all parties previously involved within 5 school days.

The decision of the Superintendent of Schools shall be final and binding upon all parties subject only to judicial review.

The grievance procedure in no way abrogates the rights of students to seek relief in the Courts.

Every. effort should be made by the student and teacher, principal, parent, or other, to resolve the grievance informally with or without the assistance of the student ombudsman.

Through each step in the grievance procedure, teachers, principal, parent, and others against whom the grievance is lodged, may be represented by an official of their organization (PFT, Principals' Association, Legal Counsel, etc.).